**Trammell CROW and Albert Susman**

**v.**

**Charlie BROWN, Milton Farris, Goodwyn Cates as Commissioners of Roads and Revenues; Earl R. Garner, as Director of Inspections & Licenses; Larry Fonts, Planning Director of Fulton County; United States Department of Housing and Urban Development; Lester H. Persells, Executor Director, Atlanta Housing Authority; City of Atlanta, Defendants.**

**Ervin Company, Intervenor,
Samuel Carr and Hattie Mae Calhoun,
Plaintiff-Intervenors.**

**Samuel CARR and Hattie Mae Calhoun,**

**Plaintiffs on behalf of themselves and others similarly situated,**

**v.**

**Charlie BROWN et al., Defendants.**

**Civ. A. Nos. 14954, 15203.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Sept. 7, 1971.

On Motion for New Trial Oct. 27, 1971.

King & Spalding, Atlanta, Ga., for Lester H. Persells.

John W. Stokes, Jr., U. S. Atty., Beverly B. Bates, Asst. U. S. Atty., for HUD and George Romney.

## ORDER

EDENFIELD, District Judge.

The City of Atlanta is a fair and progressive city which, despite its wealth, growth, and physical beauty, is beset by the same deep-seated and long-range problems that are found in most American cities today. Atlanta's slums are the root-cause of many of these problems. From these jugs of wrath emanate much of the city's crime, drug addiction, unemployment, and racial unrest.

In an attempt to combat the slums, which are inhabited mostly by poor blacks, Atlanta has been engaged in a program of low-rent public housing administered by the Atlanta Housing Authority ["AHA"]. This public housing has tended to attract large numbers of poor blacks, often illiterate and unskilled, from outlying areas and other sections of the city. At the present time over 80% of the tenants in public housing are black, and between 88% and 90% of the 30,000 people on the waiting list for such housing are black. Moreover, by design and chance, most of this public housing has been concentrated within eight of Atlanta's 132 square miles, in or near Atlanta's slums. Of the 14,000 units of public housing, 55.7% are located in areas which are 90% to 100% black, and another 19.4% in areas which are 70% to 90% black.

Atlanta lies within Fulton County, and the AHA has entered into a Cooperation Agreement with both the city and the county which commits them to assist the AHA in its public housing program. Despite this agreement, and despite the fact that the jurisdiction of the AHA extends ten miles beyond the city limits of Atlanta into unincorporated Fulton County, not a single unit of low-rent public housing has ever been built in the unincorporated area.

Moreton Rolleston, Jr., Atlanta, Ga., for plaintiffs Crow and Susman.

John N. Myer and Robert B. Newman, Atlanta, Ga., for plaintiffs-intervenors Carr and Calhoun.

Robert G. Young, Webb, Parker, Young & Ferguson, Atlanta, Ga., for defendants Brown, Farris, Cates, Garner and Fonts.

Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., for intervenor Ervin Co.

Henry L. Bowden and Ralph H. Witt, Atlanta, Ga., for City of Atlanta.

While poor blacks have been attracted to the low-rent public housing in Atlanta and the city's problems have rapidly mounted, whites have been fleeing in increasing numbers. In 1960 35% of the residents of Atlanta were black; today 51% are black. The public school population of Atlanta was 30% black; today it is 70% black. A fair percentage of the whites leaving Atlanta have moved to the unincorporated areas of Fulton County; a similar percentage of blacks from those areas have moved to the city.

Within the immediate future, unless drastic changes occur, it is not merely possible but certain that Atlanta will become, in essence, a black city with a solid white perimeter. These two lawsuits, though analytically different, have been consolidated by this court because together they involve a plan to prevent this from happening to Atlanta by having some low-rent public housing built in unincorporated Fulton County. Some may say that this plan is unwise or that it may not succeed. It is not for this court to make such a determination. Unquestionably the design of the plan is to alleviate to some degree the crisis now at hand in Atlanta, and the goal of the plan is to preserve Atlanta's future as a city in which both whites and blacks may live.

What this court must decide is whether certain actions of Fulton County officials, which have so far frustrated the initiation of this plan that may help save Atlanta, are unconstitutional and must be stopped.

## I. BOATROCK AND RED OAK

### A. Background

Plaintiffs Crow and Susman and plaintiff-intervenor Ervin Company own tracts of land which lie in the unincorporated section of Fulton County within ten miles of the city limits of Atlanta, and hence within the jurisdiction of the Atlanta Housing Authority. Both tracts of land, which shall be referred to respectively as "Boatrock" and "Red Oak", were zoned by Fulton County for the construction of apartments before plaintiffs purchased them, and they are still zoned for apartments today. Plaintiffs contend that after they purchased the tracts elaborate plans were prepared for the construction of apartment projects on the two sites and all building code and planning requirements of the County were satisfied. They intended to participate in a "turnkey" [1] project under which the completed apartments would be sold to the AHA which, in turn, planned to lease the apartments to qualified tenants. Plaintiffs claim that when defendants Brown, Farris, Cates, Garner and Fonts ["the County"] learned that Boatrock and Red Oak were to be low-rent public housing projects in which all tenants would probably be black, they caused plaintiffs' respective applications for building permits to be denied for racial reasons.

Plaintiffs contend that by such action the County has violated the Equal Protection Clause of the Fourteenth Amendment, and they seek declaratory and injunctive relief. Suits of this nature are authorized by 42 U.S.C. § 1983 (1964) and the Court finds it has jurisdiction on several bases, including 28 U.S.C. §§ 1331 and 1343(3), (4). See Gomez v. Florida State Employment Service, 417 F.2d 569, 580 (5th Cir. 1969).

In July, 1966, Mr. Joe H. Estes, owner of Boatrock at the time, filed petitions with Fulton County for the rezoning of that land from a "residential" to an "apartments" category. Action on the petitions was apparently deferred to al-

---

1. In a "turnkey" project a developer, in response to an invitation by a local housing authority, submits a proposal to build good quality housing for low-income families. If the proposal is accepted by the local housing authority and the United States Department of Housing and Urban De- velopment, the local housing authority will contract to buy the completed project with federal funds obtained through HUD. U. S. Dept. of Housing and Urban Development, Low Rent Housing Turnkey Handbook 1 (1969).

low Mr. Estes time to work on a site plan with the Fulton County Department of Planning. In November a preliminary hearing was held before the Atlanta-Fulton County Joint Planning Board concerning Mr. Estes' petitions for rezoning. The Joint Planning Board recommended that the petitions be denied as premature. On December 2, 1966 Mr. Estes appeared before the Fulton County Commissioners of Roads and Revenues and requested the approval of his petitions. At this meeting Mr. Estes stated that his project was going to be part of a large, long-range plan, and that he intended to build "nice apartments, town houses, and a shopping center." He also "called attention" to the development of an industrial park nearby and the increasing number of airline personnel expected in the area. He said he had made the necessary arrangements for utilities and would submit detailed plans to the Planning Department subsequent to the rezoning. In executive session, the Commissioners heard the planning and zoning administrators state that the Planning Department felt the petitions should be denied without prejudice because they were premature. Nevertheless, the Commissioners unanimously adopted a resolution approving the zoning change requested by Estes, "notwithstanding the adverse recommendation" of the Joint Planning Board, "subject to approval of plans by the Planning Staff." In 1967 Estes sold Boatrock to Crow and Susman.

In the spring of 1969 North American Properties, Inc., owner of Red Oak at the time, filed a petition to rezone that land from an "agricultural" to an "apartments" category. In May the Atlanta-Fulton County Joint Planning Board recommended denial of the petition. A hearing was held June 4, 1969 before the Fulton County Commissioners of Roads and Revenues at which counsel for North American, Mr. Charles Carnes, appeared and sought approval of the petition despite the adverse report of the Joint Planning Board. Mr. Carnes stated that North American was pre-pared to satisfy all planning requirements in connection with a proposed project at Red Oak, and he also submitted a list of seventeen points in reference to the project, the first of which was: "We agree to construct in accordance with the site plan." In executive session, the Commissioners adopted a resolution approving the zoning change requested by North American, "notwithstanding the adverse recommendation" of the Joint Planning Board, "pursuant with stipulations presented by Mr. Carnes." The Ervin Company obtained an option to purchase Red Oak from North American in January 1970 and took title November 5, 1970.

Meanwhile, the Atlanta Housing Authority became interested in developing low-rent public housing in unincorporated Fulton County. In May, 1969, Lester Persells, Executive Director of AHA, wrote to Walter Mitchell, Chairman of the Commissioners of Roads and Revenues, and mentioned that AHA had received an allocation of 2,000 units for low-rent public housing from the Housing Assistance Administration of the United States Department of Housing and Urban Development ["HUD"], and that AHA wanted to develop perhaps 1,000 of these units in unincorporated Fulton County. Persells suggested that a joint meeting be held to discuss plans for such housing, and such a meeting was held in July. In September, defendant E. Larry Fonts, Director of the Fulton County Department of Planning, sent a detailed site evaluation report to Persells on three sites proposed for "turnkey" projects in that portion of unincorporated Fulton County within AHA's jurisdiction. One of the three sites, "Site A", was about a hundred yards from Boatrock, and Fonts' report stated that "there are no major deterrents to development surrounding Site A in respect to land use, utilities, or transportation."

In the early part of 1970 preliminary plans were begun for the development of low-rent public housing at Boatrock and Red Oak. Plaintiffs Crow and Susman apparently had been negotiating the sale

of Boatrock to the Housing Corporation of America ["HCA"] subject to HCA's ability to get the AHA to purchase the completed low-rent public housing project under the "turnkey" program. HCA had obtained an invitation from AHA to participate in a "turnkey" program, and on February 25, 1970, HCA submitted a formal request for approval of the Boatrock site for low-rent public housing.

About this time an architectural firm apparently hired by the Ervin Company submitted site plans to Fulton County for the construction of apartments at Red Oak. Mr. Lee Fore, Vice President of the Ervin Company, testified that he advised defendant Fonts that these plans were for low-rent public housing. On April 10, 1970, the architectural firm sent the Red Oak site plans and a letter of intent to the Department of Planning as a revision of the original petition for rezoning filed by North American Properties and approved by the Commissioners of Roads and Revenues the year before. Mr. Fonts recommended approval of the site plans submitted by the architectural firm in a memorandum dated April 15, 1970, in which he also referred to the rezoning at Red Oak as "conditional."[2] A special meeting of the Commissioners was held April 15, 1970, and the official minutes of the meeting [County Exhibit No. 11] contain the following entry:

"Mr. Larry Fonts stated that they had submitted the Revised Site Plan and Letter of Intent, and felt that these Plans were very good and in order to be approved.

"Commissioner Aldredge, Chairman, stated that if there was no objection, the Revised Site Plan and Letter of Intent would be approved as presented, and made a part of said Zoning Petition.

"Hearing no objections, it was so ordered by the Board."

Apparently, however, the Commissioners were not told at that time that public housing was involved.

During the summer of 1970 the developers for Boatrock and Red Oak worked on the building plans for the public housing projects in preparation for obtaining building permits. On July 22 the AHA officially approved the Boatrock site for a "turnkey" project, and there was testimony at trial that the Red Oak site was also officially approved. By this time, however, news of the nature of the Boatrock and Red Oak projects began to spread and a number of public meetings were held in surrounding neighborhoods about it. On July 31, 1970, the Fulton County Manager, Harry West, sent a memorandum to defendants Garner and Fonts which said, in part:

"Subject: Low cost housing on Boatrock Road

\* \* \* \* \* \*

"On July 31 I discussed this memorandum and the entire project with

2. An amendment adopted by the Commissioners of Roads and Revenues July 6, 1966, and added as Section 6 to Article XXVIII of the Zoning Resolution of Fulton County (1955) provides, in part:
"1. Each category for zoning shall have a subhead thereunder to be known as 'Conditional' for that category.
2. Whenever any application for a change in the District Maps is accompanied or supported by specific plans and design for a particular development and use, and the Commissioners of Roads and Revenue, after public hearing as provided in Section 4 of this Article, approve such specific plans and design and such particular development and use and also approve such change in the District Maps, then the property may be rezoned for the proper category as set forth in the Zoning Resolution of Fulton County as 'CONDITIONAL' under that category and the Building Inspector shall issue a building permit for the development of such property only in strict compliance with the plans submitted."
In Ervin Company v. Brown, Civil No. B–61735 (Super.Ct. Fulton County, Mar. 29, 1971), it was held that the language "pursuant with stipulations presented by Mr. Carnes" used by the Commissioners when they rezoned Red Oak from "agricultural" to "apartment" use effectively rezoned the property as "conditional" within the meaning of Article XXVIII, Section 6, of the Zoning Resolution of Fulton County (1955).

Commissioner Jas. H. Aldredge and Commissioner Charlie Brown. Because of the controversy surround the [Red Oak] project which may be expanded to include this one, I have been instructed to inform you that you are not to approve plans for any low cost housing nor issue any building permits for low cost housing until such time as the current controversy has ended and you are notified that these instructions no longer apply." [Plaintiffs' Exhibit No. 22.]

Nevertheless, according to testimony of Mr. Lee Fore, of the Ervin Company, numerous conferences were held between representatives of Ervin and the County and various corrections and changes requested by the County were made in the building plans. Finally, defendant Garner, the Director of the Inspections and Licenses Department, advised Mr. Fore that everything that had to be done was done and that an application for a building permit was in order. The Ervin Company applied for the building permit and the application was denied by defendant Garner in a letter dated November 10, 1970.[3] The letter mentioned that the County had learned through the AHA that the project to be built at Red Oak was entirely different from the one envisaged when the Red Oak property was rezoned from agricultural to apartment use, and it con-

cluded with the statement that since the conditions under which the rezoning had been granted were not met the application for a building permit was denied.

The Boatrock project followed a similar path. On September 25, 1970, AHA Executive Director Persells sent a letter to defendant Fonts saying that AHA was considering a "turnkey" project at Boatrock and requesting favorable County action on a parking zone variance to be requested by the developer, HCA. On September 29 Harold Sheats, the County Attorney, sent a memorandum to Fonts and the Zoning Administrator which said:

"This is a 'hot potato'. I don't believe they can get a variance of 1 inch on anything. Be sure and keep everybody informed of developments."

HCA sent a letter to Fonts on October 6 in which it mentioned that it had been chosen by AHA to develop Boatrock and requested a parking zone variance (which was later withdrawn). During the fall months HCA representatives met periodically with Fulton County officials to discuss the furnishing of utilities and various aspects of the building plans for Boatrock. HCA also reviewed the plans with the AHA. Finally, on December 14, HCA's general contractor submitted an application for a building permit for Boatrock. The application was

---

3. The text of the letter is:

"The application filed by you on behalf of the Ervin Company for a building permit to construct certain housing structures on Campbell Drive in Red Oak is hereby denied.

"When the application for rezoning of this property from agricultural to apartment was granted, and in order to induce said rezoning, certain representations concerning the nature of the structure and the purpose of the developer in seeking rezoning and in the construction of the project were made. Among these were the representation that the structures were to be designed primarily to attract and accommodate personnel of the Atlanta Municipal Airport which is situated a short distance away, and the project when developed would produce substantial tax revenue to offset the

cost of furnishing utilities and other facilities to the site.

"We have learned through the Atlanta Housing Authority that an entirely different project is now proposed which, among other things, will reduce fantastically the payments in lieu of taxes made to the County which will thereby suffer substantial losses. Furthermore, it is evident from an examination of the plans that the purpose thereof is to accommodate a large number of residents, in excess of those represented and considered when the rezoning to apartment purposes was granted. Under these circumstances it is believed that the conditions under which the property was zoned have not been met and the application for a building permit is therefore denied."

denied by defendant Garner in a letter dated December 17, 1970, which was virtually identical to the one sent the Ervin Company.[4]

On December 23 Mr. Moreton Rolleston, Jr., counsel for plaintiffs Crow and Susman, appeared before a special meeting of the Commissioners of Roads and Revenues and requested that the building permit for Boatrock be issued so that his clients could complete performance of their contract with HCA. The official minutes of this meeting [County Exhibit No. 7] reveal that Commissioner Walter Mitchell asked the County Attorney, Mr. Sheats, whether in his opinion there was any valid reason why a building permit should not be issued for low-rent public housing at Boatrock. Sheats replied that the permit should be issued unless the applicant had not complied with representations made at the time the property was rezoned. Defendant Commissioner Brown stated that he favored "good" apartments in South Fulton and that he felt Mr. Estes had never intended to build low-rent housing at Boatrock. Commissioner Aldredge echoed Brown's feelings. Brown further stated that in view of the Commissioners' rejection of the Red Oak application, he certainly felt justified in rejecting Boatrock's as well. There was testimony at trial that Commissioners Aldredge and Brown voted against directing the issuance of the building permit for Boatrock and that Commissioner Mitchell voted in favor because he saw no legal reason why it should or could be denied.

The Assistant County Attorney, Mr. Paul Anderson, wrote to Mr. Rolleston on January 8, 1971, that the reasons given in Garner's letter of December 17 were not the only ones behind the denial of the building permit. Among other reasons, he wrote, were unresolved problems relating to storm and sanitary sewers, right-of-way on Boatrock Road, and adequate "buffer screens". Five days later Anderson, Rolleston, an employee of plaintiff Crow, and defendant Fonts met to discuss Anderson's letter, and plaintiff Crow agreed to meet the objections raised.

On January 13, 1971, Rolleston met with Commissioner Brown, newly elected Chairman of the Commissioners, and defendants Farris and Cates, who entered office as Commissioners on January 6. Rolleston again requested that Garner be directed to issue the building permit for Boatrock. The Commissioners advised him that they would not do so.

---

4. The text of the letter is:

"On December 14, 1970 application for a building permit for the above project was made by Mr. Lake McDonald.

"When the application for rezoning of this property from agricultural to apartment was granted, and in order to induce said rezoning, certain representations concerning the nature of the structure and the purpose of the developer in seeking rezoning and in the construction of the project were made. Among these were the representation that the structures were to be designed primarily to attract and accommodate personnel of Great Southwest Industrial Park and Delta Airlines and the project when developed would produce substantial tax revenue to offset the cost of furnishing utilities and other facilities to the site.

"We have learned through the Atlanta Housing Authority that an entirely different project is now proposed which, among other things, will reduce fantastically the payments in lieu of taxes made to the County which will thereby suffer substantial losses. Furthermore, it is evident from an examination of the plans that the purpose thereof is to accommodate large number of residents, in excess of those represented and considered when the rezoning to apartment purposes was granted.

"Under these circumstances it is believed that the conditions under which the property was zoned have not been met and the application for a building permit is therefore denied."

It is quite evident that the County used the letter to the Ervin Company as a model for this letter to HCA, to the extent that it says here that the rezoning was from agricultural use to apartment use (as was the case with Ervin) when, in fact, Estes had applied for rezoning from residential use to apartment use.

The next day Persells of AHA sent a letter to the Commissioners and asked that the County supply municipal services to Boatrock in accordance with the Cooperation Agreement entered into by the County and the City of Atlanta with AHA. On January 19 Mr. Rolleston filed an application for a building permit on behalf of plaintiffs Crow and Susman as landowners of Boatrock and tendered the filing fee, and Garner again refused to issue it. Thereafter HCA made additional efforts to secure the building permit without success.

## B. *Conclusions*

The entire defense of the County to the complaint as to Boatrock is, essentially, that when the Commissioners rezoned the Boatrock site for apartment construction they thought "nice" apartments would be built, and instead it is proposed that low-rent public housing be built there. Other defenses concerning the incompleteness of the building plans and lack of adequate sewer facilities for Boatrock are without foundation. Defendant Fonts testified that the final plans for Boatrock were acceptable to the Department of Planning, and a representative of the Public Works Department testified that sewer facilities for Boatrock would be ready if and when it is built.

The County's position was given during trial by defendant Commissioner Brown, who testified that the following statements he made on deposition were true:

"My principal objection is that *they never proposed to put public housing there* when the zoning application was filed and heard by the Joint Planning Board when Mr. Estes appeared before our Board.

\* \* \* \* \* \*

"I will admit that property was never proposed to be used for public housing. *That was my only opposition and is the only opposition today."* (Emphasis added.)

The County's defense as to the Red Oak complaint is the same. The plans for low-rent public housing at that location were approved in substance April 15, 1970 by the Commissioners. These plans had been described to the Commissioners as "very good" and were acceptable to the Department of Planning. The Ervin Company had complied with all prerequisites for the issuance of a building permit and, as in the case of Boatrock, the only reason defendant Garner did not issue the permit was that he was told by the Commissioners not to do so. The reason they told him not to do so was that when they rezoned the Red Oak site they did not think low-rent public housing would be built there.

■ Although the Commissioners say they want only "nice" apartments at Boatrock and Red Oak it is clear that they are not talking about the physical quality of the buildings. The evidence discloses that the cost-per-unit of the Boatrock apartments is $11,200 while the average cost-per-unit of all apartments built in Fulton County in 1970 was $9,-000. It is also clear that they are not concerned with the physical location of the buildings. An aerial photograph of the Boatrock area shows it to be, for the most part, vacant rural land bounded on one side by an industrial development. The Commissioners testified that they were aware that most tenants of public housing are black, and the court is constrained to find that the only objection the County authorities have to Boatrock and Red Oak is that the apartments would be occupied by low-income, black tenants. The official minutes of the meetings of the Commissioners, the correspondence between the parties, the letters denying the building permits, the memoranda of the County officials,[5] and

---

5. At trial the County objected to the admission of those memoranda written by the County Attorney on the ground that they were privileged communications between an attorney and his client. Only confidential communications between an attorney and his client are privileged. *See* Wirtz v. Fowler, 372 F.2d 315, 332

the testimony at trial all compel this conclusion. It is plain what Commissioner Aldredge meant when he stated his reason for denying a building permit to Boatrock:

"[W]hen this rezoning was applied for Mr. Estes had stated that nice, luxury apartments would be built *for use of executives.* \* \* \*" (Emphasis added.) [County Exhibit No. 7.]

It is true that on oral argument the County stressed its contention that the developers did not comply with original representations and that the original zoning was conditioned on such compliance. But the evidence [6] strongly suggests that the County's resort to such use of conditional zoning was a planned contrivance to be used in any situation in which public housing was involved.

■ The Boatrock and Red Oak sites are legitimately zoned for the construction of apartments. Having already zoned these sites for apartments, it should be obvious that the County may not restrict the class of Americans to be housed therein. Women's Kansas City St. Andrews Society v. Kansas City, Mo., 58 F.2d 593, 603–604 (8th Cir. 1932); *see, also,* Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917). By denying building permits for Boatrock and Red Oak the County has violated the Equal Protection Clause of the Fourteenth Amendment.

## II. THE TENANTS

Plaintiffs (and intervenors) Carr and Calhoun are black residents of Fulton County who are suing on behalf of themselves and all eligible persons currently on the waiting list of the Atlanta Housing Authority for low-rent public housing. They contend they are being denied

access to low-rent public housing outside the racially concentrated areas of Fulton County due to the arbitrary action and thoughtless inaction of the County, in violation of the Equal Protection Clause and the Civil Rights Acts of 1964 and 1968. Jurisdiction over this § 1983 suit exists under 28 U.S.C. § 1343(3) and (4).

■ For better or worse, both by legislative act [7] and judicial decision, this nation is committed to a policy of balanced and dispersed public housing. *See* Kennedy Park Homes Ass'n. v. City of Lackawanna, 318 F.Supp. 669 (W.D. N.Y.), aff'd, 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S. Ct. 1256, 28 L.Ed.2d 546 (1971); Dailey v. City of Lawton, Okl., 296 F.Supp. 266 (W.D.Okl.1969), aff'd, 425 F.2d 1037 (10th Cir. 1970); Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill.1969), enforced in 304 F.Supp. 736, aff'd, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971); Hicks v. Weaver, 302 F.Supp. 619 (E.D.La.1969). Among other things, this reflects the recognition that in the area of public housing local authorities can no more confine low-income blacks to a compacted and concentrated area than they can confine their children to segregated schools. Moreover, the court in *Lackawanna* held that even though the deprivation of plaintiffs' equal housing rights had been caused to some extent by the sheer neglect and thoughtlessness of local officials, there was, nevertheless, a violation of the Equal Protection Clause. In so holding the court there cited Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967), aff'd sub nom., Smuck v. Hobson, 408 F. 2d 175 (D.C. Cir. 1969) (en banc) in which Judge J. Skelley Wright held:

"The complaint that analytically no violation of equal protection vests un-

---

(5th Cir. 1966). These memoranda are Fulton County records and open to public inspection, [Ga.Code Ann. § 40–2701 (1970 Supp.)], so the privilege does not apply.

6. *See* page 392 of this order.

7. "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Civil Rights Act of 1964, 42 U.S.C. § 2000d (1964).

less the inequalities stem from a deliberately discriminatory plan is simply false. Whatever the law was once, it is a testament to our maturing concept of equality that, with the help of Supreme Court decisions in the last decade, we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous to private rights and the public interest as the perversity of a willful scheme." At 497.

The Fifth Circuit, quoting the above, adopted Judge Wright's view in Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286 (5th Cir. 1971) and held that in civil rights suits alleging racial discrimination in contravention of the Fourteenth Amendment actual intent to discriminate need not be directly proved. The Second Circuit adopted this view specifically in a housing context both in *Lackawanna* and in Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920 (2d Cir. 1968). The Ninth Circuit has hinted that it agrees with the Second Circuit in this matter. Southern Alameda Spanish Speaking Organization v. City of Union City, California, 424 F.2d 291, 295–296 (9th Cir. 1970). Only a showing of compelling governmental interest could overcome a finding of unconstitutionality in such thoughtlessness and inaction on the part of municipal officials. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

It is also clear that the policy of HUD requires that public housing be dispersed outside racially compacted areas. At trial, the regional director of the southeastern office of HUD testified that he was now operating under the written instructions of former HUD Secretary Robert C. Weaver in a memorandum dated September 27, 1967 to direct the building of public housing outside "ghetto" areas. Such instructions were substantially repeated by President Nixon on June 11, 1971, and are part of the national housing policy. Indeed, relief has been granted against HUD for failing to comply with this affirmative duty to disperse public housing which is implicit in the Housing Act of 1949, the Civil Rights Act of 1964, and the Civil Rights Act of 1968. Shannon v. United States Dep't. of Housing and Urban Development, 436 F.2d 809 (3rd Cir. 1970).

As this court pointed out, the public housing program in Atlanta has contributed, in no small way, to racial concentration in a compacted area. One of the consequences of this racial concentration is that it has become virtually impossible to achieve meaningful school desegregation. Indeed, as even a glimmering of objectivity will disclose, a dispersal of urban housing patterns is the only alternative to massive bussing if desegregation, rather than resegregation, is to be achieved. *See* Calhoun v. Cook, Civil No. 6298 (N.D.Ga., July 28, 1971). A second consequence has been a swelling of the unemployment rolls in the City since job opportunities have become more scarce each year, although they have increased in the suburbs. In a report to Congress and the President, the National Commission on Urban Problems stated:

> "The overwhelming majority of the future nonwhite population growth is likely to be concentrated in central cities unless major changes in public policies come about.
>
> \* \* \* \* \* \*
>
> Slums in our big cities, which are now in the midst of social decay, may well become social and economic disaster areas.

It is entirely possible that a greater concentration of Negroes in the central cities would be accompanied by an increase in tension and violence. If this violence is met by repressive measures there could be a further polarization of blacks and whites, and the flight of more and more businesses, and therefore, jobs from the city.

The suicidal consequences that such a possibility suggests are not pleasant to contemplate. They threaten our coun-

**392**

try." National Comm'n on Urban Problems, Building The American City, H.R.Doc. No. 91–34, 91st Cong., 1st Sess. 5 (1969).

 Given the decisions previously cited it is abundantly clear that, in the absence of supervening necessity, any county action or inaction intended to perpetuate or which in effect does perpetuate the conditions just described cannot stand. Nor can county action or inaction which would thwart their correction be permitted to continue.

The County defendants testified that they are aware of these conditions, yet they have come forward with no justification, compelling or otherwise, for their passivity, their refusal to cooperate, indeed their active opposition to plans designed to alleviate them. Boatrock and Red Oak, which have the approval of the AHA and HUD, are designed to reverse the trend toward racial concentration in line with the national housing policy. The County's unconstitutional efforts to prevent their construction have, until today, effectively frustrated the achievement of dispersal in public housing.

During the Boatrock-Red Oak "crisis" the Federal Housing Authority authorized a rent-subsidy program ("FHA 236" housing) in a section of unincorporated Fulton County. The County Attorney, Mr. Sheats, sent the following memorandum to defendant Garner and copies to defendant Fonts and the County Manager:

"I have learned that the proposed FHA 236 Apartment at 4455 Cascade Road will be low-cost public housing. Wave a flag, shoot a gun, ring a bell, and do everything to make all of our people aware of the situation. We do not want another Red Oak or Kimberly Road crisis."

Two weeks later Mr. Sheats sent another memorandum to defendant Fonts and a copy to Garner in which he admitted he did not see how it was possible to stop "FHA 236" housing although he hoped pending legislation would be enacted to curb the Atlanta Housing Authority. He continued:

"In the meantime, we can control the matter within some limits by making all apartment zoning in practice 'conditional' with a detailed requirement for number of units; type of structure, etc. When and if an effort is made to list these conditions, the new plans can be carefully scrutinized and precautions taken. When the question is doubtful or controversial, the Commission *ex mero motu* can call a special hearing though the conclusions reached at the public hearing would be merely educational and advisory. The Commission would not be bound."

 At the opening of the second day of trial, the court asked counsel for the County whether the County was opposed, on principle, to the construction of public housing in unincorporated Fulton County. Counsel replied that it was not, and that the Commissioners of Roads and Revenues had adopted a resolution in favor of the acceptance of public housing in unincorporated Fulton County. Such resolve, though welcome, is both inadequate and late. Taken together and viewed in their historical context, the actions of the County in resisting attempts designed to achieve the national housing policy of balanced and dispersed public housing and failing to assist such attempts violate the Equal Protection Clause of the Fourteenth Amendment. Relief from this violation of the constitutional and statutory rights of plaintiffs (and intervenors) Carr and Calhoun and the class they represent must be granted by this court.

## III. OTHER MATTERS

### A. *Res Judicata*

After their application for a building permit was denied, plaintiffs Crow and Susman filed suit in Fulton County Superior Court for a mandamus absolute to compel the issuance of a building permit. The mandamus absolute was de-

nied. Crow v. Brown, Civil No. B–61836 (Super.Ct. Fulton County, February 17, 1971). The time for taking an appeal of that decision has now lapsed. Similarly, the Ervin Company filed a suit for a mandamus absolute and it, too, was denied. The Ervin Company v. Brown, Civil No. B–61735 (Super.Ct. Fulton County, March 29, 1971). Ervin has appealed that decision and the appeal is now pending.

■ The County defendants contend that the legal issues raised by plaintiffs Crow and Susman and plaintiff-intervenor The Ervin Company were fully litigated and adjudicated by these cases in the state courts and, therefore, may not be relitigated here under the doctrine of res judicata. The court does not agree.

The two state court mandamus proceedings were concerned with the narrow, threshold question of whether municipal law imposed a peremptory duty upon the County defendants to perform the ministerial act of issuing building permits to these plaintiffs. The state courts decided only that municipal law did not impose such a peremptory duty.

The broad issue raised by these plaintiffs here, on the other hand, is whether the Fourteenth Amendment to the United States Constitution prohibits the County defendants from exercising whatever discretion allowed by municipal law for the avowed purpose of excluding low-income blacks from apartments proposed for construction on land zoned for apartments. This issue was not raised, liti-

gated, or adjudicated in the state courts and most certainly is not barred under the doctrine of res judicata.[8]

### B. *The Atlanta Housing Authority*

The Atlanta Housing Authority was founded in 1938. In the same year of its organization both the City of Atlanta and Fulton County entered into a Co-operation Agreement with the AHA by which they agreed to furnish necessary utilities and services for such projects as AHA might sponsor and to lend assistance in obtaining zoning changes when necessary. In return, AHA agreed to make certain payments to the City and County in lieu of taxes to help the local governments defray their loss of revenues from such private property as might be removed from their tax digests. These Cooperation Agreements have been periodically renewed and over the years the County has received some $1,800,000 from AHA in lieu of taxes. As this court has already noted, despite these facts no low-rent public housing has ever been placed in the unincorporated areas of Fulton County and all of AHA's activities have been confined until recently to that part of Fulton County within the city limits of Atlanta.

■ Plaintiffs Crow and Susman seek injunctive and declaratory relief against AHA on the ground that it has continued to promote racial concentration in public housing and has not vigorously attempted to get Fulton County to issue a building permit and provide municipal services for Boatrock. Plaintiffs ask the

---

8. The companion doctrine of collateral estoppel would, however, apply. In the state court proceedings, Crow v. Brown, supra, the Superior Court concluded that the building plans submitted by HCA had not been officially approved by the Department of Planning. Plaintiffs, therefore, would be estopped from raising that matter here and, in fact, have not raised it.

Similarly, in the state court proceedings of Ervin Company v. Brown, supra, the Superior Court concluded that the rezoning of Red Oak on June 4, 1969, had been "conditional as that term is used in the

amended Zoning Resolution of Fulton County (see fn. 2) and that the present building plans for Red Oak did not comply with those underlying "conditions". The Superior Court did not consider the revised plan submitted and officially approved by the Commissioners of Roads and Revenues April 15, 1970, nor did it adjudicate their status. The Ervin Company is not estopped, as a result, from contending here that the present plans for Red Oak are substantially the same as the ones officially approved by the Commissioners April 15, 1970. The court has accepted that contention.

court to enjoin future construction of AHA projects within the city limits of Atlanta until a reasonable amount of low-rent public housing is dispersed throughout Fulton County, including its unincorporated parts. AHA has vigorously contended that plaintiffs Crow and Susman lack standing to sue for such injunctive relief against AHA and its contention has some appeal. Under Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), in order for plaintiffs to have standing they must allege injury in fact and must show that the interest they seek to protect is arguably within the "zone of interests" to be protected or regulated by the statutory or constitutional provision in question. At first glance it would seem that even under *Data Processing* plaintiffs Crow and Susman, as competitors, have no standing to seek an injunction preventing AHA from authorizing and developing projects other than Boatrock within the city limits of Atlanta.

The prior history[9] and decisions in Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970), however, particularly its reiteration that the trend of recent cases is to enlarge the classes of persons deemed to have standing, suggests a contrary conclusion. If plaintiffs Crow and Susman, promoters of low-rent public housing at Boatrock, had proved during the trial that the AHA, which is also promoting low-rent public housing and in that sense competing with plaintiffs, is still engaged in furthering racial concentration in Atlanta by promoting low-rent public housing in compacted areas and failing to promote low-rent public housing in dispersed areas such as Boatrock, plaintiffs would have had grounds for relief against AHA under the Equal Protection Clause. The allegations of plaintiffs Crow and Susman were sufficient to raise this possibility of unconstitutional competition and plaintiffs arguably were within the zone of interests to be protected by the Equal Protection Clause. Therefore, under *Arnold Tours* and its predecessors, plaintiffs do have standing to sue AHA.

9. Data Processing held that Section 4 of the Bank Service Corporations Act, 12 U.S.C. § 1864 (1964), which prohibits bank service corporations from engaging in any activity other than the performance of bank services for banks, arguably brought within its zone of interests the right of a data processing association to be protected from competition by national banks in the provision of data processing services. As a result, the data processing association was deemed to have standing to seek injunctive relief against the Comptroller of Currency who had issued regulations designed to permit national banks to provide such services. Arnold Tours was a companion case brought by travel agencies to restrain competition by national banks which, under the authority of regulations issued by the Comptroller of Currency, had entered the travel business. The Supreme Court vacated the decision of the First Circuit in Arnold Tours which had held that plaintiffs lacked standing and remanded the case to the First Circuit for reconsideration in light of the Data Processing decision.

On remand, the First Circuit interpreted Data Processing to give the data process-

ing association standing because the legislative history revealed that Congress had the protection of data processers specifically in mind when it authorized entities to engage in data processing for banks.

"Clearly the Court did not feel that the mere fact that they were in competition with the defendant bank gave them standing. Had it intended so substantial a change in the law it would not only have written a quite different opinion in *Data Processing;* it would have reversed us out of hand." Arnold Tours, Inc. v. Camp, 428 F.2d 359, 361 (1st Cir. 1970).

Plaintiffs in Arnold Tours again appealed and the Supreme Court, in a terse per curiam opinion, reversed. Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970). The Court held that when national banks enter the travel business they compete with travel agencies no less than they compete with data processers when they provide data processing services to their customers. The Court took pains to reiterate that the trend is "toward enlargement of the class of people who may protest administrative action." At 46, 91 S.Ct. at 159.

However, plaintiffs proved no such thing. On the contrary, the evidence was that better than 93% of all units now proposed by AHA are to be built in areas having a population between 80% and 90% white. Furthermore, AHA's approval of Boatrock and Red Oak and its attempts to secure municipal services from Fulton County for Boatrock—including the filing of a crossclaim in this action—show that AHA's present desire is to disperse public housing. No relief against AHA is warranted.

AHA's crossclaim against the County is based on the contention that the County has violated the letter and spirit of the current Cooperation Agreement to which the County, AHA, and the City of Atlanta are parties by failing to assist in the placement of low-rent public housing in unincorporated Fulton County. The Cooperation Agreement, as already noted, provides in part that the County cooperate with AHA by providing municipal services and assisting in zoning matters so that projects approved by AHA may be built. Nothing in this Agreement specifically obligates the County to rezone particular tracts of land for public housing use or to direct the issuance of building permits for particular types of projects. The crossclaim will be dismissed.

## C. *HUD*

Plaintiffs Crow and Susman also seek declaratory and injunctive relief against Secretary Romney and HUD on grounds similar to those advanced in their claim against the AHA.

The evidence shows that HUD makes no initial site selection for low-rent public housing; it merely approves or disapproves selections made by local housing authorities and assists in funding approved selections. It also appears that HUD has expressly disapproved several projects recently which would have furthered racial concentration in compacted areas, and that it has expressly approved projects to be constructed outside such compacted areas, including

Boatrock and Red Oak. No relief against HUD is warranted.

## D. *The City of Atlanta*

Finally, plaintiffs Crow and Susman have sought injunctive relief against Atlanta to prevent it from issuing building permits for public housing which would further racial concentration in compacted areas. There has been no proof that the City is about to do this, and no relief against the City will be granted.

## IV. REMEDY

For the foregoing reasons it is hereby ORDERED that, effective today:

1. The Commissioners of Roads and Revenues of Fulton County are enjoined from issuing any instructions to any Fulton County official to refrain from issuing building permits for the "Boatrock" and "Red Oak" projects;

2. Defendant Garner shall issue building permits for the "Boatrock" and "Red Oak" projects;

3. All Fulton County officials are enjoined from interfering in any way with the construction and completion of the "Boatrock" and "Red Oak" projects;

4. (a) The Commissioners of Roads and Revenues of Fulton County and other County officials such as the Director of the Department of Planning are to meet with representatives of the Atlanta Housing Authority within 10 days to appoint a joint committee which will draw up a list of general areas that lie both within the unincorporated sections of Fulton County and the jurisdiction of the Atlanta Housing Authority in which low-rent public housing would be appropriate.

(b) This joint committee shall, within 30 days after such meeting, draw up such a list with a view toward full compliance with the national housing policy of balanced and dispersed public housing;

(c) Within 60 days after the completion of such a list, the joint committee shall prepare detailed site evalua-

tion and planning reports and recommendations for more specific localities within the general areas that would be appropriate for low-rent public housing under the national housing policy. Representatives of the City of Atlanta and the federal government may be called upon for assistance in the preparation of such reports.

(d) Copies of all lists and reports shall be served upon the Atlanta Housing Authority, the regional office of HUD, the Commissioners of Roads and Revenues of Fulton County, and this court.

(e) Within 30 days after the submission of such reports and recommendations by the joint committee, the Commissioners of Roads and Revenues shall meet with representatives of the Atlanta Housing Authority for the purpose of implementing the recommendations of the joint committee. The results of that meeting shall be reported to this court.

5. The prayers for relief of plaintiffs Crow and Susman against defendant Persells and the Atlanta Housing Authority, Secretary Romney and HUD, and the City of Atlanta, are denied.

6. The crossclaim of the Atlanta Housing Authority against defendants Brown, Farris, Cates, Garner and Fonts is dismissed.

On Motion for New Trial

ORDER

The County defendants in these two cases which had been consolidated for trial have now moved this court for a new trial or, in the alternative, to amend judgment.

In its order of September 7, 1971 this court ruled on both Crow v. Brown and Carr v. Brown. In the *Crow* case the court concluded that the County defendants had denied building permits for two apartment projects which were to be built on land the County had already zoned for apartments because they did not want blacks to live in them. The evidence conclusively showed that the County's objection to "public housing" at the two sites involved was, in reality, an objection to the housing of blacks there. The court held that the County defendants had denied the equal protection of the laws to the developers who brought suit and ordered the County to issue the building permits.

In *Carr* the court found that this nation, through its executive, judicial, and legislative branches, has now committed itself to a policy of balanced and dispersed public housing. Insofar as this policy relates to Fulton County where the tenants of public housing overwhelmingly are black, the court noted that it reflects an awareness that local officials may not segregate blacks to certain sections of the County any more than they may segregate black children to certain schools. The court found that since 1938, however, not a single unit of public housing has been built in the unincorporated sector of Fulton County and that instead federal, state, and local officials had caused or permitted public housing in the County to be concentrated in the black sections of the City of Atlanta, in or near its slums. The court reviewed a series of recent cases from several jurisdictions which have held that cities, local housing authorities, and even the United States Department of Housing and Urban Development have violated the Equal Protection Clause by causing or permitting such concentration of public housing. The evidence before this court, however, established that HUD, the City of Atlanta, and the Atlanta Housing Authority had already reversed their past practices so that now over 93% of the public housing proposed by the AHA is to be built in white areas throughout Fulton County. Only the County has persisted and, as its treatment of the two projects approved by HUD and the AHA in the *Crow* case reveal, has now also displayed its active opposition to the dispersal of public housing. The court concluded that the County's action and inaction in this area amounted to a denial of the equal protection of the laws to the two

blacks on the waiting list for public housing who brought suit on their own behalf and on behalf of those similarly situated. As a remedy this court ordered that the County and the AHA meet to develop and implement a program of balanced and dispersed public housing throughout the County, specifically in the unincorporated sector. The court did not impose a minimum or maximum number of units to be built nor did it specify any locations; such matters were left to the sound discretion of the County and the AHA. In short, this court ordered the County to start obeying the law of the land.

The court, having reviewed its findings and conclusions and having fully considered the brief accompanying the County's motion, perceives no. basis for the granting of the motion. Accordingly, the motion of defendants Brown, Farris, Cates, Garner and Fonts for a new trial or, in the alternative, to amend judgment, is denied.