Abdon **ACEVEDO** et al., Plaintiffs-Appellants,

v.

**NASSAU COUNTY, NEW YORK**, its officials, employees and agents, et al., Defendants-Appellees.

No. 963, Docket 74–1235.

United States Court of Appeals, Second Circuit.

Argued March 15, 1974.

Decided July 2, 1974.

Richard F. Bellman and Lois D. Thompson, Suburban Action Institute, Tarrytown, N.Y. (J. Christopher Jensen, Suburban Action Institute, Tarrytown, N.Y. and Leonard S. Clark, Nassau County Legal Services, Hempstead, N.Y., on the brief), for plaintiffs-appellants.

Cyril Hyman, Asst. U. S. Atty. (Edward John Boyd V, U. S. Atty. for the E.D.N.Y., and Raymond J. Dearie, Asst. U. S. Atty., on the brief), for defendant-appellee General Services Administration.

Joseph Jaspan, County Atty. of Nassau County, (Natale C. Tedone, Senior Deputy County Atty., Mineola, N.Y., on the brief), for defendant-appellee Nassau County and Its Officials, Employees, and Agents.

John F. O'Shaughnessy, Town Atty., Hempstead, N.Y., on the brief for defendants-appellees Town of Hempstead, Town Board of the Town of Hempstead, and the Officials, Employees, and Agents of the Town of Hempstead.

Before HAYS and TIMBERS, Circuit Judges, DAVIS,* Judge.

HAYS, Circuit Judge:

Appellants[1] brought this suit as a class action against appellees Nassau County, the Town of Hempstead, New York, various officers of the county and the town, the General Services Administration, and other governmental bodies and government officials. The complaint alleged Nassau County, the Town of Hempstead, and their respective officials violated the rights of appellants and others similarly situated by abandoning plans to include low income family housing on a parcel of land known as Mitchel Field. The complaint further alleged that the General Services Administration and other federal agencies violated federal sttautes, regulations, agreements, and executive orders by planning a federal office building for the same site without considering the adequacy of low income housing in the area.

The district court conducted a trial and concluded that abandonment of the housing plan was not illegal because it had neither a discriminatory effect nor

---

* Honorable Oscar H. Davis, Associate Judge of the United States Court of Claims, sitting by designation.

1. Appellants are alleged to be members of low income minority groups and two organizations that represent members of low income minority groups.

a discriminatory motive. It also concluded that GSA had acted in accordance with law in selecting and planning for the federal building. The court therefore dismissed the complaint.

We affirm on the ground that appellants failed to state a claim on which relief can be granted.

### I.

Mitchel Field is a parcel of land in the Town of Hempstead, Nassau County, New York, which formerly served as a United States Air Force base. In 1961 after the Air Force had abandoned its operations there the land was declared surplus to the needs of the federal government.

Nassau County purchased approximately 630 acres of the parcel, free of any deed restrictions. The General Services Administration retained 55 acres for federal use. In 1968 the county and the town agreed to create an independent corporation, the Mitchel Field Development Corporation (MFDC), to formulate plans for the utilization of the county's parcel. After some study the corporation recommended a plan which included 1,700 housing units for low, middle, and upper income families.

After release of the plan MFDC held public hearings on its proposals. The hearings revealed substantial public opposition to the plan, especially to the inclusion of low and middle income housing. To calm fears that such housing would become a tax burden on the town MFDC recommended that housing not be constructed at the site until after the development of commercial enterprises which would produce tax revenues.

In the 1970 campaign for County Executive, appellee Caso, who was a candidate for the office, declared his opposition to any housing on the site. Upon his election he dissolved MFDC and transferred its functions to county agencies.

The county has continued to include a variety of educational, commercial, and recreational facilities in its plans for Mitchel Field. It also planned to include 250 units of senior citizen housing. The execution of these plans has been delayed by the refusal of the Department of Housing and Urban Development to fund the project. The regional administrator of HUD testified that the town had developed or was developing several projects for senior citizen housing but none for low income family housing. He testified further that, since senior citizen housing is occupied predominantly by whites and the low income family housing predominantly by minorities, the agency believed that section 808 of the Civil Rights Act of 1968 authorized it not to fund the project unless the town also provided for low income family housing.

Appellants contend that the decision not to construct low income family housing was due primarily to community opposition and that "community opposition to this form of housing has been racially motivated."

In 1968 Congress approved construction of a Post Office facility at Mitchel Field. Subsequently GSA revised and expanded the proposed facility so that now it is planned that it will contain offices for about twelve agencies employing about 2,000 persons. Because of the changes GSA revised its proposed prospectus and in January 1973 forwarded it for approval to the Office of Management and Budget. In October OMB returned the revised prospectus for further revisions because certain federal agencies had withdrawn from the project. In January 1973 officials from HUD and GSA met to implement the Memorandum of Understanding between the two agencies. It was agreed that GSA would circulate to various federal agencies a questionnaire to determine facts about the racial and economic composition of the employees of the proposed facility. GSA forwarded the information compiled to HUD. Appellants contend that GSA has not discharged its responsibilities under the Memorandum.

### II.

█ Appellees have no constitutional or statutory duty to provide low income

housing. There is no "constitutional guarantee of access to dwellings of a particular quality." Lindsey v. Normet, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L. Ed.2d 36 (1972).

■ Appellants argue, however, that once appellees began to plan low income housing for Mitchel Field they could not, consistent with the Fourteenth Amendment, abandon the plan if to do so would have a disproportionate impact on minority groups, unless appellees could show a "compelling state interest" for the abandonment. This argument fails upon the authority of Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L. Ed.2d 438 (1971). As Justice Black stated, 403 U.S. at 227, 91 S.Ct. at 1946:

> "Probably few persons, prior to this case, would have imagined that cities could be forced by five lifetime judges to construct or refurbish swimming pools which they choose not to operate for any reason, sound or unsound."

As in *Palmer*, appellees here instituted a plan which, though it might have benefitted minority groups and promoted integration, they were not compelled to undertake in the first place.[2]

All of the cases on which appellants rely involve either the refusal of a governmental body to grant benefits equally to all or the governmental obstruction of private projects beneficial to minority

groups or to integration.[3] Here appellants seek not to remove governmental obstacles to proposed housing but rather to impose on appellees an affirmative duty to construct housing. This is clearly not required by any provision of the Constitution.

Appellants claim a denial of equal protection because appellees have continued plans to construct low income housing for senior citizens at Mitchel Field. Appellants contend that housing for senior citizens is occupied predominantly by whites and that the inclusion of this type of housing while excluding low income family housing, which would be occupied predominantly by minority persons, is discriminatory.

■ Of course, it is true that appellees, having decided to construct low income housing for senior citizens at Mitchel Field, would have to operate that housing in a non-discriminatory fashion. But there is no authority holding that once a city or county initiates low income senior citizen housing the Fourteenth Amendment requires it to build a certain amount of low income family housing, too. In Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), the Court upheld a state scheme which gave higher grants to aged, blind, and disabled persons than to recipients under the Aid to Families with Dependent Children program on

2. The parties have devoted much attention to the question of whether the plan was only a proposal or a commitment, tentative or final, amorphous or concrete, in its formative stages or quite complete. *Palmer* demonstrates that the parties wasted their time in this controversy. The pools closed in *Palmer* had been built and were in use. Stage of construction played no part in the Court's decision.

3. See, e. g., United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, 493 F.2d 799 (5th Cir. 1974) (city refused to extend water and sewer service to low income housing project although it had extended service to other developments); Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972), modified, 473 F.2d 910 (6th Cir. 1973) (city refused to issue building permit for low income housing project

and restricted such projects to segregated neighborhoods); Crow v. Brown, 332 F. Supp. 382 (N.D.Ga.1971), aff'd, 457 F.2d 788 (5th Cir. 1972) (per curiam) (county officials refused to issue building permits for low income housing project); Gautreaux v. Chicago Housing Authority, 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971) (city effectively restricted low income housing projects to segregated neighborhoods); Kennedy Park Homes Association v. City of Lackawanna, 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) (city rezoned parcel to prevent construction of low income housing project); Dailey v. City of Lawton, 425 F. 2d 1037 (10th Cir. 1970) (city denied building permit and zoning change to low income housing project).

the ground that the legislature might rationally conclude that the latter could more easily bear the hardships of inadequate income. 406 U.S. at 549, 92 S.Ct. 1724. The same rationale justifies the housing scheme here.

In *Jefferson* the Court also analyzed the racial impact of the state scheme. Plaintiffs alleged that the scheme entailed invidious racial discrimination because the category of AFDC recipients, who received 75% of computed need, contained a higher proportion of blacks and Mexican-Americans than the categories of aged and blind and disabled recipients who received 100% and 95% of computed need. The Court held that the different ethnic compositions of the groups did not invalidate the system. 406 U.S. at 548–549, 92 S.Ct. 1724.

We cannot conclude that appellees invidiously discriminated by providing low income senior citizen housing at Mitchel Field without also providing low income family housing. "Whether or not one agrees with this [decision], there is nothing in the Constitution that forbids it." 406 U.S. at 549, 92 S.Ct. at 1733 (footnote omitted).

### III.

Appellants also raise a rather vague claim under the Fair Housing Act of 1968, 42 U.S.C. §§ 3601–3631 (1970). They do not indicate upon which sections of that act they rely and it is difficult to imagine what sections could support their position.

■ The Fair Housing Act does not impose any duty upon a governmental body to construct or to "plan for, approve and promote" any housing.

Of course, under section 808(e)(5) of the Fair Housing Act, 42 U.S.C. § 3608(d)(5) (1970), HUD has a duty to

"administer the programs and activities relating to housing and urban de-

velopment in a manner affirmatively to further the policies of this subchapter."

On the authority of the statute HUD might be justified in denying appellees funding for other projects if they refuse to approve low income housing. Indeed, that is precisely what happened here. But HUD's discretionary powers under the Act extend beyond the duties imposed by the Act on local housing plans. HUD's action does not mean that appellees have violated section 804 of the Act.

### IV.

■ Appellants claim that the General Services Administration has violated the Fair Housing Act, Executive Order 11512, its Memorandum of Understanding with the Department of Housing and Urban Development, and its own regulations by failing to insure an adequate supply of low income housing near the federal office building planned for Mitchel Field. The claim fails because none of the pronouncements implies a private right of action and because appellants lack standing.

Under Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), appellants must allege they have suffered an "injury in fact" and that they seek to protect an interest "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830. Appellants satisfy neither of the requirements.

The order, regulation, and memorandum seek to insure that GSA will consider availability of low and middle income housing for federal employees near federal buildings.[4] Assuming that GSA

---

4. Executive Order 11512, 35 Fed.Reg. 2979 (1970), directs the Administrator of the GSA to perform certain duties, consult and coordinate programs with several other federal agencies, and to be guided by seven policies

in the selection of federal building sites. The sixth of these policies is:

"The availability of adequate low and moderate income housing, adequate access from other areas of the urban center, and

has violated the three pronouncements, appellants have not shown that they are harmed by the violation or that they would benefit from remedying the violation. None of the appellants is or expects to become an employee at the proposed facility. At the most they can only hope that any steps GSA might take to implement the pronouncements would result in the construction of more low income housing than is required for employees at the building and that some of the appellants or the persons they purport to represent might occupy the additional housing. This possibility is too remote to amount to an injury in fact.

Appellants also fail to satisfy the "zone of interests" facet of the standing test. The purposes of the Executive Order, Memorandum of Understanding, and the GSA regulations with respect to low income housing are to assure accommodation of federal employees.[5] As we

have noted, none of the appellants is or expects to be an employee at the proposed facility.

The Executive Order and Memorandum of Understanding also seek to insure that the GSA will consider the general socio-economic impact of federal building site locations on the areas in which such facilities will be located.[6] Appellants have not shown that location of the office building at Mitchel Field or any act or omission by GSA regarding that building has injured them. Certainly they have not shown, or even alleged, any harm from the building's impact upon "social and economic conditions in the area" which would differentiate them sufficiently from the general public to constitute an "injury in fact."

■ Even if appellants could pass the constitutional test of standing, they would still have to show that the Executive Order, regulation, or Memorandum of Understanding were intended to cre-

---

adequacy of parking will be considered. . . ."

41 C.F.R. § 101–17.104–1(a) (1973) declares that GSA

"will consider to the maximum extent possible the availability of low and moderate income housing for employees without discrimination because of race, color, religion, or national origin. . . ."

41 C.F.R. § 101–18.102(d)(6) (1973) essentially restates the language of the above-quoted passage of Executive Order 11512.

The Memorandum of Understanding between HUD and GSA announces that its purpose is "to assure for [GSA] employees the availability of low- and moderate-income housing without discrimination. . . ." 41 C.F.R. § 101–17.4801 (1973).

5. See text of 41 C.F.R. § 101–17.104–1(a) (1973), supra note 4, and statement of purpose of the Memorandum of Understanding, id. Section 2(a)(6) of the Executive Order does not expressly limit its purpose to housing for federal employees. However, the same sentence indicates that adequacy of parking and of access from other parts of the urban area are to be considered. These two factors clearly show that the entire sentence is designed solely for the benefit of federal employees.

6. Section 1 of Executive Order 11512 provides that the Administrator shall

"(c) coordinate proposed programs and plans for buildings and space in a manner designed to exert a positive economic and social influence on the development or redevelopment of the areas in which such facilities will be located . . . ."

In section 2(a) one of the policies which the Administrator is ordered to weigh is expressed as follows:

"(2) Consideration shall be given in the selection of sites for Federal facilities to the need for development and redevelopment of areas and the development of new communities, and the impact a selection will have on improving social and economic conditions in the area. In determining these conditions the Administrator shall consult with and receive advice from the Secretary of Housing and Urban Development, the Secretary of Health, Education, and Welfare, the Secretary of Commerce, and others, as appropriate . . . ."

The Memorandum of Understanding declares that GSA will

"consider the need for development and redevelopment of areas and the development of new communities and the impact on improving social and economic conditions in the area, whenever Federal Government facilities locate or relocate at new sites, and to use its resources and authority to aid in the achievement of these objectives." 41 C.F.R. § 101–17.4801 at 107 (1973).

ate private rights of action. None of them expressly grants such a right. Of course, such rights may be inferred when necessary to effectuate the purposes of a statute or regulation. See J. I. Case Co. v. Borak, 377 U.S. 426, 431–434, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). But where the source of the statute or regulation has been silent, courts do not lightly infer such rights.[7] In this case we see no need to find an implied private right of action that would extend to appellants. The obligations created by the Executive Order, Memorandum of Understanding, and GSA regulations are so broad and vague that inferring a private right of action in them would create a strong possibility of protracted lawsuits brought by persons with little at stake before any federal facility could be constructed. We decline to authorize such a result.

Finally, it appears that GSA has essentially complied with the Executive Order, Memorandum of Understanding, and with its own regulations. GSA is required only to consult with HUD and to consider the adequacy of low and middle income housing. As noted in the statement of facts, because of changes in the proposed facility GSA has not yet forwarded a new proposed prospectus to the Office of Management and Budget. It has made some studies and has consulted with HUD. What more may be done before the final proposed prospectus is submitted is a matter of pure speculation at this time. We need not determine the precise scope of GSA's duties until a suit has been brought by the proper party at the proper time.

Affirmed.

DAVIS, Judge (concurring):

I join in the result and also fully in Parts I, II, and III of the court's opinion, but with an addition and a caveat as to Part II. I agree that, for this case, it makes no difference whether the original Mitchel Field housing plan (which included public low-income housing) was definite or tentative. In either case it had not left the planning level before it was changed to omit the low-income housing feature, and appellants could abandon the plan without violating a constitutional or statutory duty. But if the stage of the planning should make a difference, I would hold that the "plan" on which appellants rely was no more than a series of proposals, suggestions, and recommendations for action by Nassau County and other agencies or groups; no definitive or operative action was taken to adopt those proposals which always remained in the process of being evaluated. In a word, if there was a "plan" it was still inchoate, not definitive.

My caveat relates to a housing project which has left the planning stage and

---

7. The Court of Claims has held in Chambers v. United States, 451 F.2d 1045, 196 Ct.Cl. 186 (1971), that Executive Order 11478, which prohibits racial discrimination in federal employment, does confer a private right of action. However, the Eighth Circuit has gone the other way on the same question. Gnotta v. United States, 415 F.2d 1271 (8th Cir. 1969), cert. denied, 397 U.S. 934, 90 S. Ct. 941, 25 L.Ed.2d 115 (1970). Moreover, it has been uniformly held by other federal courts that executive orders do not create private rights of action. See, e. g., Kuhl v. Hampton, 451 F.2d 340 (8th Cir. 1971); Farkas v. Texas Instrument, Inc., 375 F.2d 629, 633 (5th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967); Manhattan-Bronx Postal Union v. Gronouski, 121 U.S.App.D.C. 321, 350 F.2d 451, 457 (1965), cert. denied, 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966); Farmer v. Philadelphia Electric Co., 329 F.2d 3, 9 (3d Cir. 1964). We need not decide whether an executive order can ever be enforced by private suit. We hold only that we see neither an intent nor a compelling need to create such a remedy here.

This does not mean that executive orders do not have the force of law. See *Farkas, supra*, 375 F.2d at 632; *Farmer, supra*, 329 F.2d at 7.

gone into full operation. If an existing public low-income project which had lasted for some time were to be abandoned by its public owner because of proven racial discrimination, *e. g.* because too many of the tenants turned out to be black or Puerto Rican, I am not at all certain that Palmer v. Thompson, 403 U.S. 217, 91 S.Ct. 1940, 29 L. Ed.2d 438 (1971), would control. That case involved swimming pools, not housing, and at least some of the Justices of the majority seemed to indicate that the proof of discrimination was not overwhelming.

As for Part IV of the court's opinion, I concur in it, too, except insofar as it may tend to suggest that the Executive Order involved here created no private rights of action in anyone, not even federal employees. That question is unnecessary to consider in this case which does not concern present or potential federal workers. Depending on their contents and purpose, certain executive orders can and do create private rights of action vindicable in court. Perhaps the most significant in recent years, at least for federal employees, was § 14 of Executive Order No. 10988, 27 F.R. 551, Jan. 18, 1962, *see* 5 U.S.C. § 7301 (1970), which extended to nonveteran civil service employees the statutory protections given veterans against discharge and other adverse personnel actions. That Executive Order and its successor (Executive Order No. 11491) have been regularly enforced, for over twelve years, by the federal courts in a large number of injunction and declaratory actions and in suits for monetary claims. *Cf.* Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15, 1974, pp. 140–145, 94 S.Ct. pp. 1638–1640, esp. p. 142, 94 S.Ct. p. 1638, n. 7 (opinion of Mr. Justice Rehnquist), p. 169, 94 S.Ct. p. 1652 (opinion of Mr. Justice Powell), pp. 172–175, 94 S.Ct. pp. 1653–1654, esp. p. 174, 94 S.Ct. p. 1654 n. 4 (opinion of Mr. Justice White).