**POTTS v. CITY OF UTICA.**
No. 81.

Circuit Court of Appeals, Second Circuit.
Nov. 30, 1936.

Bartle Gorman, Corp. Counsel, of Utica, N. Y., and M. Francis Malone, Asst. Corp. Counsel, of Utica, N. Y., for defendant-appellant.

White & Case, of New York City (David Paine and Henry M. Marx, both of New York City, of counsel), for plaintiff-appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

In an action at law tried to a jury in the District Court for the Northern District of New York, a verdict for the plaintiff was returned on which judgment was entered for $39,732.27 and costs, and the defendant has appealed. This was the remainder found due the plaintiff for services and disbursements under a contract to perform professional work for the defendant as an engineer under the circumstances about to be stated. Diversity of citizenship is the basis of jurisdiction.

In November, 1930, the City of Utica, N. Y., was obtaining its supply of water

for public and private use from the system of a private corporation called the Consolidated Water Company under a contract fixing rates which would expire on the 25th of the following June. Desiring to be prepared to negotiate a new contract at fair rates or to acquire the water system, the defendant decided to take steps to put itself in possession of essential data upon which to determine which course to pursue as is shown by the following ordinance which was adopted unanimously by its common council on November 19, 1930:

"Ordained, That the Corporation Counsel be and he is hereby authorized and directed to obtain and employ the service of such experts and assistants as may be deemed necessary to provide a thorough investigation; to determine and establish a fair and reasonable rate to be charged for water furnished by the Consolidated Water Company to the City of Utica, a municipal corporation, and to the other consumers within the City of Utica; to learn and establish the correct and just valuation of the property and rights of the Consolidated Water Company; to establish and determine the fair and just basis for a new contract with the Consolidated Water Co.; and to report such recommendation as may be deemed advisable as to the acquisition of the said Consolidated Water Company's property and rights, either through purchase or condemnation. The compensation of such experts and assistants shall be determined by the Board of Estimate and Apportionment." On the same day the common Council authorized a bond issue of $60,000 to provide funds to carry out the objects stated in the ordinance.

Acting under the authority thus given him, the corporation counsel consulted the plaintiff, an engineer of skill and experience in the kind of work to be done, regarding his employment to do it. A few days later, on January 20, 1931, the plaintiff wrote to the corporation counsel in part as follows:

"Agreeable to the talk I had with you on the 17th would say I have given the matter of the inventory and appraisal of the Utica Water Works much thought. All of the data in Mr. Shaw's office relating to the former inventories and appraisals is usable and will save much time and labor and also expense to the City. After giving this due consideration I believe an outside figure for bringing appraisals down to date will not exceed $15,-000.00 which would include all engineering and auditing services.

"My charges for this work for myself and the men of my organization would be on a per diem basis in accordance with the following schedule:

"(The prices ranged from $100.00 for himself to $20.00 for his lowest paid assistant.)

"In addition to this per diem charge, there would be, of course, any traveling expenses to and from Utica, and living expenses while in the City. We are prepared to give the matter immediate attention."

The plaintiff's terms of employment were satisfactory and he was engaged accordingly. On February 5, 1931, the Board of Estimate and Apportionment passed a resolution setting out the substance of the ordinance above quoted and providing:

"That the rates for expert services to carry out the aforesaid investigation be and the same hereby are approved as follows:

"1. All traveling and local expenses of such experts and assistants as may be necessary to complete such investigation.

"2. The following rates of compensation shall be paid for all time necessary for such work in the City of Utica, or elsewhere:

"Clyde W. Potts, Chief Consulting Engineer, $100.00 per day. * * *

"To all other assistants, whether engineers, accountants, clerical or other help, from $10.00 to $45.00 per day, according to the grade of work performed."

The plaintiff thereupon proceeded to do the work contemplated when he had the interview with the corporation counsel in January and had that substantially done by the 23d of June, 1931, when he filed a preliminary report. A few days before that the special counsel, acting for the city "in an investigation of the Consolidated Water Company for the City of Utica," filed a preliminary report, stating, inter alia, that it had been decided that "the best protection that could be afforded to the citizens of Utica, both now and for the future, would be to place the regulation of water rates under the jurisdiction of the Public Service Commission of the State of New York," and that, after consulting Mr. Potts and oth-

ers, the matter had been presented to the Legislature, with the result that "the Water Company on July 1st, will be compelled to file with the Public Service Commission a schedule of rates for the district served by the Water Company. * * * Immediately upon the filing of the schedule of rates by the Water Company a decision should be made as to the necessity for commencing a rate case. * * * Of course, this decision will depend upon the schedule filed by the company. In the event that such a rate case is necessary, the material compiled by your engineer and counsel will comprise, in a large measure, the evidence to be adduced in the city's side of the case. Hence, the publication of such data and material to become available to the counsel and engineers for the Water Company would be unwise at this time."

It transpired that such a rate case was commenced and that the plaintiff assisted throughout its prosecution to a decision largely in accord with his contentions made in behalf of the city. He spent considerable time helping prepare for numerous hearings and testified at some of them. His charges for all this work and for that performed by his assistants in connection with the rate case were made at the prices fixed for the work he was employed to do at first. He presented bills to the city which were audited and paid to the amount of $43,672.81, which included vouchers presented and approved for all services and expenses before the rate case was begun and those for some months after it was commenced. The last payment was in November, 1932, which was in full up to the preceding February. The complaint alleged that the plaintiff had duly filed his account for audit which had been refused to the amount of $35,916.41. A second cause of action on an account stated was abandoned on the trial.

The answer filed by the defendant admitted the making of the contract sued on; the performance of the services; the refusal to audit and pay the claim filed; and denied any balance due. Before trial, a motion for leave to amend was granted, and the defendant filed an amendment to the answer, putting in issue the validity of the alleged contract.

At the close of the plaintiff's evidence, and again when the evidence had all been introduced, the defendant moved to dismiss the complaint on the ground "that nowhere in the proof has there been any evidence introduced for the plaintiff that would show in any way any person or public official of the City having authority granted or given by a body that would have a right to grant authority, namely, the Common Council of our city, to engage any experts of any kind in the prosecution of the action charged against the Consolidated Water Company." Both motions were denied and exceptions allowed.

As it appears that the plaintiff has already been paid for all of his charges for services and expenses performed and incurred in doing the work that the parties had in mind when he was at first employed, we will confine ourselves to the issue now material, which is whether the city became bound to pay for the services and expenses of the plaintiff in connection with the rate case before the Public Service Commission.

■ Utica being a city subject to the provisions of the New York Second Class Cities Law (Consol.Laws N.Y. c. 53), it has been asserted that the contract was invalid under section 120 of that statute because involving more than $500 and not let through bidding. But it is apparent that the subject matter of the contract was the performance of professional services and the payment of necessary expenses incurred in their performance. It was made under the authority of an ordinance passed unanimously by the common council, and the plaintiff's rate of charges were unanimously approved by the Board of Estimate and Apportionment. Such action was a compliance with that part of the statute, providing for determination in this way, that it was impracticable to procure the work through bidding. Moreover, the statute itself does not cover in respect to bidding professional services which are technical and whose value depends upon the skill with which they are performed. Vermeule v. City of Corning, 186 App. Div. 206, 174 N.Y.S. 220, affirmed 230 N.Y. 585, 130 N.E. 903; People v. Flagg, 17 N.Y. 584; Harlem Gaslight Co. v. City of New York, 33 N.Y. 309. The defendant relies upon Wooley v. City of Schenectady, 226 App.Div. 383, 236 N.Y. S. 104, which may be distinguished on the ground that the employment was not in accordance with the Educational Law (Consol.Laws N.Y. c. 16) which there applied and does not here; and on Heaton

v. City of Cohoes, 270 N.Y. 222, 200 N. E. 795, where it was held that the services for which the plaintiff was employed by the mayor and which were rendered did not fall within the scope of the mayor's authority to employ, a proposition dependent upon considerations not here involved. It is also said that the contract was void in that it was not executed by the mayor with the city seal affixed in accordance with section 55 of said statute (Second Class Cities Law). It is enough to dispose of this point that it was not raised on the trial, though our doing so should not be taken as acquiescence in the theory that a city cannot make a valid contract unless the mayor signs it under seal. See Beechwood Gun Club, Inc., v. City of Beacon, 153 Misc. 358, 275 N.Y.S. 249, affirmed 242. App.Div. 761, 275 N.Y.S. 219. So we conclude that the contract made with the plaintiff rested upon such compliance with statutory requirements that it was valid and binding upon the city.

■ But that is less than enough to sustain this judgment. It is clear and undisputed that no rate case before the Public Service Commission was contemplated when the contract was made. All agree that that was decided upon some months later, and the plaintiff himself urges the additional work that entailed as the reason why his charges and expenses so far exceeded the estimate of $15,000 which he made to the corporation counsel. It included preparation adequate for forty-four hearings before the Public Service Commission, assisting at those hearings and giving testimony before that body. This was work beyond the scope of the original contract which the common council authorized in terms and as clearly outside its intended scope, since no one then foresaw that the method which would be adopted for rate fixing would be first an amendment of the law by the New York Legislature putting the Water Company under the jurisdiction of the Public Service Commission and then protracted hearings by that body to establish the rates. So we are brought to the conclusion that the contract as made did not embrace the services and expenses included in the judgment below.

■■ The remaining question is whether the defendant is bound to pay on any theory of ratification of a new contract covering the additional services and expenses. No express contract of that nature was made, so the inquiry centers upon whether an implied promise to pay arises out of what was done. Little time need be spent in showing that there can be no implied promise because of mere performance, for, if that were so, the statutes governing contracts with municipalities would be largely nullified. The rule is, on the contrary, that municipal corporations can only contract in the mode prescribed by law, and persons dealing with them are bound to know the law limiting the power and authority of the officials who act for the municipality. Hawkins v. United States, 96 U.S.(6 Otto) 689, 24 L.Ed. 607; McDonald v. Mayor, 68 N.Y. 23, 27, 23 Am.Rep. 144; Smith v. City of Newburgh, 77 N.Y. 130. As was said in Whiteside v. United States, 93 U.S. 247, 257, 23 L.Ed. 882: "Although a private agent, acting in violation of specific instructions, yet within the scope of his general authority, may bind his principal, the rule as to the effect of the like act of a public agent is otherwise, for the reason that it is better that an individual should occasionally suffer from the mistakes of public officers or agents, than to adopt a rule which, through improper combinations or collusion, might be turned to the detriment and injury of the public." Nor does performance with the knowledge and approval of agents and officers of the defendant not having power to bind the city in an express contract for the services amount either to ratification or an implied promise to pay. The rule of strict limitation of power to that actually possessed by public officers and agents applies throughout the entire course of dealing. Village of Fort Edward v. Fish, 156 N.Y. 363, 50 N.E. 973.

■ But this does not apply to officials or agents who have the power to contract in behalf of the defendant. As we have seen, the common council could authorize the employment of the plaintiff as an engineer to perform personal services for the city. However, section 121 of the Second Class Cities Law which applies to this defendant provides in part that: "No contract shall be let [which involves a total expense of over five hundred dollars, without the consent of the Common Council as provided by law], except after the receipt of sealed bids or proposals therefor." Section 125 provides that: "No person shall have power to make any purchase or contract any debt for which the city shall be liable unless specifically

authorized by the provisions of this chapter." And section 120 limits the power of the common council in such instances to bind the city only by a vote of at least four-fifths of all its members, and that action must receive the unanimous approval of the Board of Estimate and Apportionment.

There is enough to show that the common council did know that the rate case was being prosecuted before the Public Service Commission, for on February 19, 1932, it unanimously passed an ordinance which received the unanimous approval of the Board of Estimate and Apportionment authorizing the issuance of "corporate bonds of the City of Utica in the sum of $60,000 for the purpose of providing funds for the employment of expert services and all other expenses incidental and necessary for" the purposes stated in the former ordinance authorizing the first bond issue already mentioned and "for the prosecution of the rate case now pending before the Public Service Commission." At that time the plaintiff had been at work for some months on the rate case. Such work was necessary to the prosecution of the case, and so was a necessary expense to defray which the bond issue was authorized. On February 17, 1932, the corporation counsel had reported to the common council, giving a general summary of what had been done in regard to water rates and the then status of the rate case. He said in part: "In my opinion, the affirmative proof to be presented by the city has been especially well prepared by the experts employed by the city. It will be necessary on each occasion, as new and further proof is offered by the Water Company, for the city's experts, engineers and accountants to make further and additional examinations and investigations of the proof and the exhibits offered to substantiate the same in order to rebut and offset the claims made by the Water Company." He further said that it was impossible exactly to determine the cost to the city to complete the rate case and that: "In order that sufficient money may be available to carry this case to a successful conclusion, I would recommend that a bond issue be authorized in the sum of Sixty Thousand ($60,000) Dollars."

Thus it is made plain that the common council knew when it took the above action on the recommendation of the Corporation Counsel that experts had been employed and were at work on the rate case. Due to an irregularity in the proceedings of February 19th, the common council again voted the bond issue on April 20, 1932, for the same purposes, and it was again approved by the Board of Estimate and Apportionment. The plaintiff had rendered bills for services and expenses in connection with the rate case which had been audited and paid in the amount of thousands of dollars before the common council took this action. Indeed, on June 17, 1931, the Corporation Counsel submitted to the Common Council a report he had received from the special counsel employed showing that the plaintiff had been working on the appraisal and had been consulted by them as to the advisability of trying to have the Legislature amend the law so as to put the Water Company under the jurisdiction of the Public Service Commission; that he had approved the idea and rendered valuable assistance in getting that done. So it is plain that it knew that the plaintiff had been employed as an expert to assist in prosecuting the rate case and that he was so working. In this way his employment for such purpose was ratified and adopted by a body acting in behalf of the defendant which had the power to authorize such employment and consequently the power to ratify an employment not in the first instance authorized by it. Vermeule v. City of Corning, supra.

█ It is urged that this suit must fail for lack of proof that the plaintiff, after presenting his claim for audit, failed when dissatisfied to appeal to the Board of Estimate and Apportionment as provided by section 64 of the Second Class Cities Law. The theory is that such an appeal is a condition precedent to the bringing of this suit. However, there is no such express provision in the statute. On October 9, 1934, a final amended proof of claim was filed by the plaintiff in the office of the defendant's comptroller for audit. Under the law it could not have been audited for five days nor could the comptroller have been required to audit it within two weeks after the expiration of such five days. It was not audited and this suit was brought on November 2, 1934, after such two weeks had passed. The contract which formed the basis of this claim was made by an agent of the defendant, whose acts, as we

have seen, were duly ratified so that the city was bound. There was created a general liability of the city to pay whatever became due under the contract by reason of performance. This being so, it was incumbent upon the plaintiff to present his claim and upon refusal to audit and pay his cause of action against the city accrued. Such refusal was alleged in the complaint and admitted in answer. See Davidson v. Village of White Plains, 197 N.Y. 266, 90 N.E. 825; New York C. R. R. Co. v. County of Westchester, 173 App.Div. 263, 159 N.Y.S. 560. The statute relied on merely provides that a dissatisfied claimant may appeal to the Board of Estimate and Apportionment. Neither expressly nor by necessary implication does it make such an appeal a necessary step in perfecting a claim. Compare Jones v. City of Albany, 151 N.Y. 223, 45 N.E. 557; Marcy v. City of Syracuse, 199 App. Div. 246, 247, 192 N.Y.S. 674.

What we have already said makes it unnecessary to discuss any exceptions to the charge. In view of the right of the plaintiff to have the motions to dismiss denied, there was no error in submitting the cause to the jury, and we find none in the manner of submission.

Affirmed.