**BROOKHAVEN HOUSING COALITION,** Brookhaven Branch N.A.A.C.P., Smithhaven Ministries, Plaintiffs,

Rosemary Tarry, Gloria Young, Carolyn Johnson, Doris Acree, Vickie Jordan, Lucille Middleton and Nora Rush, Plaintiffs-Appellants,

v.

Joel SOLOMON, Administrator, General Services Administration, Gerald Turetsky, Regional Administrator, General Services Administration, Jerome Kurtz, Commissioner, Internal Revenue Service, Philip E. Coates, Regional Commissioner, North Atlantic Region, Internal Revenue Service, Town of Brookhaven, New York, Brookhaven Town Board, John Randolph, Brookhaven Town Supervisor, Charles W. Barraud, Brookhaven Town Planning Board, John Luchsinger, Chairman, Brookhaven Town Planning Board, Defendants-Appellees.

No. 897, Docket 78–6001.

United States Court of Appeals, Second Circuit.

Argued May 1, 1978.

Decided Aug. 14, 1978.

Lewis M. Steel, New York City (Richard F. Bellman, Eisner, Levy, Steel & Bellman, P. C., and Nathaniel R. Jones, James I. Meyerson, NAACP, New York City, of counsel), for plaintiffs-appellants.

Cyril Hyman, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (David G. Trager, U. S. Atty., and Harvey M. Stone, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y., of counsel), for federal defendants-appellees.

Raymond W. Giglio, Jr., Asst. Town Atty., Brookhaven, Patchogue, N. Y. (Joseph R. Mulé, Town Atty., Brookhaven, Patchogue, N. Y., of counsel), for Town of Brookhaven, defendant-appellee.

Before MOORE, OAKES and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

Plaintiffs appeal from an order entered by the District Court of the Eastern District of New York (Hon. George C. Pratt), dismissing their complaint against various officials of the General Services Administration, the Internal Revenue Service and the Town of Brookhaven, New York. Appellants are a class comprised of three organizations and eight individual low income IRS employees who allege that they or their members are unable to secure adequate housing in proximity to their jobs at the IRS Brookhaven center. They seek to compel the Town of Brookhaven either directly or indirectly through the federal appellees, to perform an alleged contractual commitment to implement a program directed toward meeting the housing needs of low and moderate income employees of the IRS center.

I

FACTUAL BACKGROUND

This case has an extended procedural history. In April of 1970, the GSA issued a solicitation for offers to house a new IRS regional center. After receiving thirteen lease proposals, the GSA approved an award of a lease for a twenty-year term to the Town of Brookhaven on September 4, 1970. The original plaintiffs, various civil rights organizations and several black residents of the Town of Brookhaven, filed a complaint in August of 1971 seeking to enjoin the Administrator of the General Services Administration ("GSA") and the Commissioner of the Internal Revenue Service ("IRS") from occupying the IRS facility then under construction in Brookhaven. Plaintiffs alleged that the federal defendants had violated provisions of EO 11512,[1]

---

1. Executive Order 11512, 35 F.R. 3979–80 (1970), provides in part:

"(2) Consideration shall be given in the selection of sites for Federal facilities to the

which imposes a duty on GSA to consider the availability of housing in the vicinity when selecting sites for federal installations, and Title VIII of the Fair Housing Act, 42 U.S.C. § 3608,[2] which requires federal officials to act affirmatively to promote equal housing opportunities for minorities.

In March of 1972 the plaintiffs sought a preliminary injunction to restrain IRS from occupying the Brookhaven center and to enjoin GSA from disposing of certain surplus housing units situated about twenty-five miles from the IRS facility at the Suffolk Air Force Base in Southampton. The use of these units for housing, plaintiffs asserted, could constitute a partial remedy for the defendants' alleged failure to comply with relevant federal regulations. The District Court, the late Judge Orrin G. Judd, determined that plaintiffs had made a sufficient showing of non-compliance with EO 11512 to justify balancing the relative hardships attendant on the grant or denial of preliminary relief. Judge Judd decided, however, that since plaintiffs had expressed concern about the availability of housing as early as the fall of 1970 but had not sought preliminary relief until the facility had been substantially completed, no injunction against occupancy should issue. He did, however, enjoin the GSA from disposing of the Air Force housing units *pendente lite*. *Brookhaven Housing Coalition v. Kunzig*, 341 F.Supp. 1026 (E.D.N.Y. 1972).[3]

By order of July 25, 1972, the District Court held further that the suit was maintainable as a class action. In an order entered on September 13, 1972, the court defined the class as:

> "All non-white persons residing or seeking to reside in the Towns of Brookhaven, Islip, Smithtown and Southampton, and all persons residing or seeking to reside in said towns who are eligible for low income housing as defined in applicable state or federal statutes and regulations." [4]

The IRS moved into its Brookhaven facility during the summer of 1972. In March of 1973, the plaintiffs filed an amended supplemental complaint which added the Town of Brookhaven and various town officials as defendants. The first claim for relief alleged that the federal defendants had failed to comply with site selection procedures mandated by the Executive Order and Fair Housing Law. The second claim alleged that the federal defendants had failed to enforce commitments made by the Town of Brookhaven concerning low and moderate income housing for IRS employees. Plaintiffs' third and fourth claims for relief were directed against the Brookhaven defendants based upon their failure to implement alleged housing commitments made to the federal defendants.[5] Plaintiffs

---

need for development and redevelopment of areas and the development of new communities, and the impact a selection will have on improving social and economic conditions in the area. In determining these conditions the Administrator shall consult with and receive advice from the Secretary of Housing and Urban Development, the Secretary of Health, Education, and Welfare, the Secretary of Commerce, and others, as appropriate;

.    .    .    .    .

"(6) The availability of adequate low and moderate income housing . . . will be considered[.]"

2. Title VIII of the Fair Housing Act, 42 U.S.C. § 3608(c), provides:

"All executive departments and agencies shall administer their programs and activities relating to housing and urban development in a manner affirmatively to further the pur-

poses of this subchapter and shall cooperate with the Secretary to further such purposes."

3. On June 5, 1975, Judge Judd amended the preliminary injunction to allow GSA to sell the property on sealed bids provided that the purchaser agreed not to discriminate against tenants requiring governmental assistance in order to meet their rental obligations.

4. Notice was directed to members of the class. *See Brookhaven Housing Coalition v. Sampson*, 65 F.R.D. 24, 25 (E.D.N.Y. 1974).

5. In their prayer for relief under the third claim, plaintiffs requested that the District Court enter a judgment which would, *inter alia,* compel "the local defendants to establish a plan and a program to implement said plan which will lead to the construction of decent housing units for employees of the IRS Center in Brookhaven and to the construction of increased and improved housing opportunities

averred that, as third-party beneficiaries of the alleged contract, they were entitled to seek enforcement from the federal and town officials of a claimed contractual commitment to "provide whatever programs would be necessary to meet the housing needs" of employees at the IRS center.

In early 1975, the federal defendants (hereinafter "the Government") filed a motion to dismiss asserting that plaintiffs, none of whom were IRS employees, lacked standing to sue. Subsequently, eight IRS employees, six black and two white, sought leave to intervene, alleging that they were unable to find adequate housing near the facility. By order dated March 20, 1975, the District Court granted the motion to intervene and denied the Government's motion to dismiss.

The case came to trial in May of 1976. After plaintiffs acknowledged that they no longer sought to enjoin occupancy of the IRS facility, but rather sought only a declaratory judgment that GSA had failed to comply with site selection procedures, Judge Judd dismissed the first claim for relief. Six days after the trial concluded, Judge Judd died without having rendered a decision on the other claims. The case was reassigned to Judge Pratt, and the parties stipulated to allow Judge Pratt to render his findings of fact and conclusions of law on the trial record made before Judge Judd.

In May of 1977, Judge Pratt filed an extensive memorandum decision in which he determined: (1) The plaintiffs had standing to sue the federal defendants;[6] (2) Before awarding a contract to build and lease the center, the Government had considered the adequacy of housing in proximity to the proposed installation, thereby complying with EO 11512 and Title VIII of

the Fair Housing Act;[7] (3) Before GSA accepted Brookhaven's bid, Special Town Attorney Bloom had sent a letter to GSA indicating that if a need for additional low or moderate income housing for IRS employees developed, the Town would take steps to provide such facilities; (4) The housing needs of low income IRS center employees had not been met; and (5) Because the record was inadequate to resolve whether the Special Town Attorney's representations were binding on Brookhaven, a supplemental hearing was necessary. The District Court held a second hearing on the contract question in September of 1977. On October 27, it entered a second memorandum decision and order. Having concluded that plaintiffs had failed to establish any enforceable contractual commitment with respect to housing, Judge Pratt dismissed the complaint in its entirety.

Appellants have now abandoned their original claim that the Government failed to comply with site selection standards mandated by the Fair Housing Act or Executive Order. Rather, they maintain only that the District Court erred in finding that Brookhaven made no contractual commitment. The Government has cross-appealed, alleging that whatever rights appellants may have against the Town of Brookhaven, they have no standing to sue and no right to compel action by the federal defendants.

## II

## JURISDICTION

Relying on *Evans v. Lynn,* 537 F.2d 571 (2d Cir., *en banc,* 1976), *cert. den. sub nom. Evans v. Hills,* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977), the Government

---

for low and moderate-income families residing in the Brookhaven area."

**6.** Plaintiffs invoked jurisdiction under 5 U.S.C. §§ 701–706; 28 U.S.C. §§ 1331, 1343(3) and (4), 1361, 2201, 2202; 42 U.S.C. §§ 1981, 1982, 1983, 1985, 3601 *et seq.*; and the Fifth and Fourteenth Amendments to the Constitution.

**7.** In *Brookhaven Housing Coalition v. Kunzig, supra,* Judge Judd resolved the question which this court declined to reach in *Acevedo v. Nas-*

*sau County,* 500 F.2d 1078 (2d Cir. 1974), by holding that private citizens have a right to review compliance with EO 11512 since they are within the zone of interests to be protected by the order and statute. 341 F.Supp. at 1029–30. *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Cort v. Ash,* 422 U.S. 66, 78–79, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

submits that appellants lack standing to maintain this action because "they have not suffered the injury in fact" necessary to make out an ordinary case or controversy under *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). While that is true of the class members who are not employees of the IRS center, we do not view the cases cited as controlling with respect to the intervening plaintiffs who work at the Brookhaven facility.

*Warth* involved a challenge to a municipality's exclusive zoning ordinances by low and moderate income group members who alleged that they had unsuccessfully sought housing in the town and that the effect of its zoning provisions was to exclude low and moderate income residents. The Court held that plaintiffs' reliance on the "little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise" was insufficient to establish an "actionable causal relationship" between the town's zoning practices and the plaintiffs' asserted injury. 422 U.S. at 507, 95 S.Ct. at 2209. In fact, plaintiffs' description of their financial situation and housing needs suggested that their inability to reside in the town was a consequence of the economics of the area housing market rather than the town's allegedly unconstitutional acts. 422 U.S. at 506, 95 S.Ct. 2197.

Plaintiffs in *Evans v. Lynn, supra,* were residents of low income predominantly black housing areas in Westchester County who alleged that the Department of Housing and Urban Development and the Department of Interior had improperly awarded grants to the Town of Newcastle in Westchester County for construction of a sewer and acquisition of a park area in violation of the obligation of government agencies to effect non-discriminatory housing objectives. None of the plaintiffs claimed that he had sought housing in the town; they asserted rather that, had the grants not been approved, the money could have gone to some other projects for housing within their means. A majority of this court held, *en banc,* in a 5 to 4 decision, that the plaintiffs had no standing since they had not alleged "specific, personal, adverse results" from the sewer and park grants. 537 F.2d at 590.[8] By contrast here, employees of the IRS center who require low or moderate income housing in the vicinity are directly affected by the Town's failure to discharge its alleged contractual commitment.[9]

We find, therefore, that appellants have alleged a sufficient injury in fact to satisfy the threshold standing requirement of Article III. That does not meet the Government's further objection, however, that plaintiffs have not alleged a statutory right or contractual obligation which they are entitled to enforce against the federal defendants. As noted previously, appellants have now abandoned their claim that the Government failed to comply with Executive Order 11512. They do, however, submit that as third-party beneficiaries of the

8. The other case on which the Government relies, *Acevedo v. Nassau County, supra,* is similarly inapposite. Plaintiffs there were low income members of minority groups and two organizations who claimed that the GSA had violated EO 11512 by failing to ensure adequate low income housing near a proposed site for a Government facility. Since none of the plaintiffs was, or expected to be employees at the installation, their only stake in the litigation was the hope that whatever steps GSA might take to comply with the executive order would result in low income housing construction beyond what was required for employees at the facility.

9. The Town appellees argue here as they did before Judge Pratt, that they have discharged whatever contractual commitment Bloom made with regard to housing. They rely on testimony by Louis Levy, Chief of the Acquisition Branch for GSA, that there was ample housing available in Islip when Brookhaven's bid was considered, and on testimony by GSA Regional Administrator Turetsky, that in most instances since award of the bid, Brookhaven had "responded positively" concerning housing. Such expressions of opinion by GSA officials are insufficient, however, to discredit Judge Pratt's careful and detailed findings of fact concerning the inadequacy of the local housing market for low income IRS employees. The findings become irrelevant on the merits in the light of our conclusion that there was no contract, *see* parts III and IV *infra.*

alleged contract between GSA and Brookhaven, they have status to seek relief from both the federal and municipal defendants. While the Government maintains that a third-party beneficiary of a contract cannot sue the *promisee* of such contract, appellees' claim is sufficiently colorable to sustain jurisdiction. *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). We do not reach that question on the merits, however, since we affirm the District Court's finding that the appellees made no enforceable contract concerning housing.

## III

### CONTRACTUAL INTENT

Brookhaven submitted an offer to construct the IRS facility in June of 1970. On August 12, 1970, officials of GSA, IRS, and HUD met in Washington to discuss the availability of low income housing near the proposed facility. HUD's Deputy Assistant Secretary for Equal Opportunity advised GSA and IRS representatives that Suffolk County communities had been dilatory in developing proposed housing programs and urged "that the selection of the IRS Data Center be used as a means of getting the County to move forward." The representative of GSA, the agency which controlled the contract arrangements, took the position that the federal government could not impose a housing commitment as a condition to the award, but agreed to solicit information from the Town concerning its position on housing for Government employees prior to announcing the award.

Several weeks later, on September 3, Gerald Turetsky, Regional Administrator of GSA, and William Green, Regional Director of HUD, met in New York with Special Town Attorney Bloom to discuss ways in which federal money could be used to encourage low and moderate income housing.

As a result of that meeting, Attorney Bloom sent a letter to GSA dated September 4, which contained the following statement:

"The Town of Brookhaven will provide whatever programs would be necessary to meet the housing needs for all Federal employees which may develop as a result of the award of the project to the Town of Brookhaven."

Judge Pratt found, after a supplemental hearing, that plaintiffs failed to meet their burden of proving that, at any relevant time up to the creation of a binding contract between the Town and GSA, the Town Board members had known about the Bloom letter or had known that the letter had been sent for the purpose of inducing GSA to award the project to Brookhaven. He concluded that the September 4 letter did not constitute an enforceable contractual commitment because the plaintiffs had not established that Bloom had actual or apparent authority to bind the Town, or alternatively, that the Town Board had ratified Bloom's assurances by its subsequent execution of the lease.

### A. *Actual or Apparent Authority*

New York Town Law § 64(6) provides that a town:

"[m]ay award contracts for any of the purposes authorized by law and the same shall be executed by the supervisor in the name of the town *after approval by the town board.*" (Emphasis added)

The Brookhaven Town Board passed no resolution authorizing Special Attorney Bloom to send the letter of September 4, 1970, and the letter was not signed by the Town Supervisor.[10] We recognize, of course, that a municipality's power to incur contractual obligations is subject to statutory conditions and may be exercised only in the manner prescribed by law. *Scarborough Properties*

---

10. In addition, Brookhaven was operating under the strictures of a special home rule resolution. To bid for the IRS facility, Brookhaven required legislative authorization beyond that granted to towns under New York general laws. Thus, in 1970, acting on Brookhaven's home rule request, the New York legislature passed a special law empowering the Town "upon adoption of a resolution" to take certain enumerated actions which contemplated construction of an office building for lease to the federal government. 1970 Laws of New York, Chap. 972 § 2.

*Corp. v. Village of Briarcliff Manor,* 278 N.Y. 370, 16 N.E.2d 369 (1938). *And see Soundview Woods, Inc. v. Town of Mamaroneck,* 14 Misc.2d 866, 871, 178 N.Y.S.2d 800, aff'd, 9 A.D.2d 789, 193 N.Y.S.2d 1021 (2d Dep't 1959). Under the circumstances here, however, we find it unnecessary to rely solely on the failure to comply with New York law on municipal corporations since Bloom was without actual or apparent authority in the general sense.[11]

Bloom testified that he had never been granted authority by the Town Board to bind the Town, and that he had never held himself out as having authority to bind the Town. He further stated that he did not characterize the letter as a contractual commitment of the Town, but rather "[a]s an indication of what I thought was the concept in the Town of Brookhaven relating to housing in general." His testimony was, as Judge Pratt found, consistent with the fact that he had never formally notified the Town Supervisor or Town Board members of the representation contained in the September 4 letter.

Appellants argue, however, that even if Bloom did not have actual authority, or did not expressly hold himself out as having power to commit the Town to a housing program, there are nonetheless other circumstances indicating his apparent authority to do so. In appellants' view, the resolution authorizing Councilmen Reid and Rogers to submit a bid, and the resolutions authorizing Bloom's appointment to handle legal matters were broad enough for the inference of such authority.[12] They contend further that Bloom's letter simply confirmed oral commitments made by the negotiating team to Turetsky of the GSA in August.

The difficulty is that, assuming that Reid and Rogers, as the negotiating team, had apparent authority to submit bids,[13] it does not follow that they had power to commit Brookhaven—without specific authorization—to a program of low income housing, a matter which could involve substantial financial expenditure by the Town. Moreover, neither Reid nor Rogers testified that they had made oral commitments to Turetsky regarding low income housing. Nor did either of them see Bloom's letter before it was sent.[14] Turetsky testified only that he

11. We need not decide whether state law or federal common law governs the third-party beneficiary claims here involved since the parties point to no material differences between New York and federal common law with respect to the issues raised on this appeal. *See Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Bank of America National Trust & Savings Association v. Parnell,* 352 U.S. 29, 77 S.Ct. 119, 1 L.Ed.2d 93 (1956); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

12. The texts of the resolutions concerning Bloom's authority appear in note 15, *infra.*

13. Appellants contend that the team's apparent authority to bind the Town without its express consent is evidenced by their submission of a bid reducing the lease price per square foot from $7.50, the amount authorized by the Town Board's June 16 resolution, to $7.25 per square foot, without any official authorization for the reduction. We note, however, that the Town Board, by its June 25 resolution, contemplated that a further reduction beyond the $7.50 bid might be necessary; it provided that the bid would be "subject to final negotiations with the General Services Administration on July 2, 1970." Moreover, the $7.25 bid submitted by the negotiators and signed by the Town Supervisor expressly stated:

"This revised bid is submitted upon further consideration by the Town of Brookhaven after the conference held with the GSA and IRS representatives on Thursday, July 2. . . . "

Although these qualifications on the negotiating team's autonomy might have been insufficient to exonerate the Town if GSA had accepted the $7.25 bid and the Board had declined to approve it, they did put the GSA on notice that a Board resolution was required and in fact, as noted *infra* p. 592, the Town Board did by resolution on September 15 ratify the reduced bid.

14. At his deposition, Bloom stated that he had not read the letter to Reid before sending it but simply "told him in general terms that I was going to write a letter dealing with the availability of housing in the Town of Brookhaven and the history of our desire to see to it that people who worked at the IRS center, if there were any who needed housing, that we would try to get it for them." At trial, Bloom testified that he thought he had had the discussion with Reid after, not before, sending the letter.

had discussed items in the letter with Reid and Rogers at the August meeting before the letter was sent. He did not claim that Reid and Rogers had made any oral commitments concerning a housing program.

Thus, the question reduces itself to whether Bloom, acting independently, had apparent authority to bind the Town. Not only did Bloom lack such authority under general common law principles of agency, *see Restatement (Second) of Agency,* §§ 27, 161A, 166 (1958), but it has long been established that "those seeking to deal with a municipal corporation through its officials, must take great care to learn the nature and extent of their power and authority." *McDonald v. Mayor,* 68 N.Y. 23, 27 (1876). A public authority is not bound by a declaration of its agent "unless it manifestly appears that the agent was acting within the scope of his authority, or that he had been held out as having authority . .." *Hawkins v. United States,* 96 U.S. 689, 691, 24 L.Ed. 607, 608 (1872). Here Bloom testified that he had never claimed authority to bind the Town and the Town Board's resolutions did not by their terms so authorize him.[15]

▮ Nor can appellants claim estoppel, for they failed to present convincing evidence that the federal government was misled with respect to the scope of Bloom's authority. We do not overlook the affidavit by Regional Administrator Turetsky stating that:

> "on receipt of said [September 4] letter and in reliance upon the Town's commitment stated therein with respect to housing, the New York Regional Office by letter dated September 14, 1970 accepted the Town's offer."

Apart from Turetsky's assertion, the record is barren of any indicia of reliance on Bloom's authority. When queried at trial as to whether Bloom's letter was a material factor in the award decision, Turetsky responded:

> "Again, I have to answer that principally in the negative, saying that I did not ignore their assurance to us that they would cooperate in our efforts to house federal employees but they had already earned the award at this stage by the submission of their bid and our independent finding of availability of low and middle income housing."

Turetsky testified further that he did not regard such a program as

> "specifically and legally required by [E.O.] 11512 because we had initially made a positive finding with regard to the availability of low and middle income housing."

In short, according to Turetsky, who gave the affidavit on which appellants so heavily rely, GSA's solicitation of the September 4 letter was principally based on a desire

> "to build a file which would demonstrate our concern on the availability of housing and the attitude of town officials toward housing, low-and-middle income groups, rather than our need for additional housing information to justify our site selection and the executive order requirements."

There is, moreover, some rather telling circumstantial evidence that GSA did not view Bloom's letter as constituting a binding contractual commitment. Included in the lease authorized by Town Board resolution was a schedule titled "Miscellaneous Provisions" which apparently had been incorporated from the original solicitation for

Rogers testified that he had never seen the letter and had not even known of its existence until shortly before trial.

15. On June 2, the Board resolved that "Oscar J. Bloom and David Sloane be appointed to handle legal matters pertaining to this matter." The June 16 resolution in part provided: "That Oscar J. Bloom and David A. Sloane be continued on as attorneys in reference to the negotiations being conducted with the General Services Administration in any and all

matters relating to the execution of any contracts between the General Services Administration and the Town of Brookhaven as it may effect awards here too, the follow-up with the bonding attorneys in New York relative to possible borrowings, and the miscellaneous matters relating to the construction of the said building should the same award be made to the Town of Brookhaven for such construction. . . . ."

bids. Section B–12 of the schedule listed certain award factors to be considered "in determining which offer will be most advantageous to the Government." One such factor was the "availability of adequate housing for low and middle income employees within reasonable proximity." As Judge Pratt noted, this entire section of award factors was stricken from the lease, and both the Town Supervisor and the GSA official initialled the page containing the deletion. Such a deliberate excision is inconsistent with a belief on the part of GSA officials that Bloom's representation regarding implementation of a housing program was part of the contract with Brookhaven.

## B. *Ratification*

■ Appellants maintain that even if Bloom lacked apparent or actual authorization to speak for Brookhaven on matters relating to housing, the Town nonetheless ratified his assurances by its adoption of the lease negotiated by its subcommittee.[16] The lease, appellants point out, contained a reduction from the $7.50 per square foot price authorized by the Board in June, to $7.25 a square foot. We are urged to infer from the Board's approval of this price reduction negotiated by its subcommittee that the Board effectively assented to all other representations made by Bloom, Reid or Rogers during negotiations, including Bloom's statement with regard to housing.

Such an inference is unwarranted on the facts presented here. The Board's knowledge and approval of the bid reduction is clearly apparent from its passage of a resolution on September 15 reciting the salient features of the lease arrangement including the $7.25 price.[17] There is no comparable evidence of its assent to a housing program. All mention of housing as an award factor had been stricken from the lease, and none of the Board members who testified recalled having seen Bloom's letter before trial. Nor did any recollect a specific discussion by the Board concerning implementation of a low and moderate income housing program.[18]

16. Appellants also point to the Town Board's resolution of August 13, which resolved that:

"the Town Board take action to encourage the providing of housing within the economic means of families within the Town of Brookhaven, investigate private and public means to accomplish such action, and investigate the possibility of establishing a Town Housing Authority to coordinate such matters."

Passage of that resolution is, in appellants' view, "clear evidence that the Town Board's members understood that Brookhaven might be required to make a housing commitment in order to obtain the IRS Center." But that argument begs the two critical questions bearing on the ratification issue: whether the Town Board in fact understood that a commitment had been made and whether it had signified its assent. We are unable to fathom how passage of a resolution on August 13 could indicate knowledge of, or accession to, representations made in a letter dated September 4. Moreover, the Town's resolve to take certain unspecified actions to encourage housing and to investigate means of accomplishing that end scarcely signifies a willingness to incur the substantial financial obligations which might attend implementation of a housing program.

17. Moreover, the language of the Town Board's resolution authorizing the $7.50 bid suggests that the Board was aware that its price was subject to further negotiation. *See* note 13 *supra*.

18. Since passage of resolutions relating to the IRS center had occurred almost seven years before the supplemental hearing, the Town Board members' recollections were admittedly hazy. John Bellport testified that while he knew that Bloom had sent a letter, he could not recall seeing it before trial. He could not recollect any discussion of housing by the Board and believed that he would not have voted for the IRS center if he had had to vote for subsidized housing. Councilmen William Rogers and Alex Proias, and former Town Supervisor, Charles Barroud, all testified that they could not remember seeing the September 4 letter before the trial. Rogers acknowledged that he was aware of Bloom's assurances regarding a housing program but did not indicate that the Town Board ever discussed the matter. Barroud testified that there was no discussion by the Town Board concerning provision for low income housing around the time the bid was accepted. Although Proias recalled that advocates of low income housing had appeared before the Board, possibly in connection with the IRS center, he did not recall any suggestion being made to the Town Board that Brookhaven would have to agree to provide housing for IRS employees in order to obtain the project. Rather, he had viewed the center as giving jobs to people already residing in the vicinity.

Under such circumstances, the Board's acceptance of a lease with the $7.25 bid price cannot be taken as an endorsement for all alleged representations made by its negotiating team, particularly since the specific reference to housing was physically deleted from the contract. To find ratification by a municipality there must be " 'express assent, or . . . acts or conduct of the principal, inconsistent with any other supposition than that he intended to adopt and own the act done in his name.' " *Seif v. City of Long Beach,* 286 N.Y. 382, 387, 36 N.E.2d 630, 631 (1941), quoting *Peterson v. Mayor of New York,* 17 N.Y. 449, 453 (1858). The Brookhaven Town Board passed no resolution which either explicitly approved Bloom's assurances or was implicitly "inconsistent with any other supposition" than that it intended to implement a housing program.[19]

## IV

## ENFORCEABILITY

■ Even if we were to accept appellants' argument that GSA and Brookhaven had made a contract concerning housing on which they, as third-party beneficiaries, were entitled to sue, we would find Bloom's representations unenforceable for lack of specificity. A court cannot decree performance of an agreement unless it can discern with reasonable certainty and particularity what the terms of the arrangement are. To consummate an enforceable agreement, the parties must not only believe that they have made a contract, they must also have expressed their intent in a manner susceptible of judicial interpretation. 1. *Corbin on*

Contracts § 95 (1963); 5A *Id.* § 1174; 1. *Williston on Contracts* § 37 (3d ed. 1957); *Restatement (Second) of Contracts* § 32 (Ten. Draft 1973). If essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result. *Ginsberg Machine Co. v. J. & H. Label Processing Corp.,* 341 F.2d 825 (2d Cir. 1965); *Transamerica Equipment Leasing Corp. v. Union Bank,* 426 F.2d 273, 274 (9th Cir. 1970); *Willmott v. Giarraputo,* 5 N.Y.2d 250, 184 N.Y.S.2d 97, 157 N.E.2d 282 (1959); *Ansorge v. Kane,* 244 N.Y. 395, 398, 155 N.E. 683 (1927).

■ The offer in Bloom's letter, which the Town Board allegedly authorized or ratified and which GSA allegedly accepted was that:

> "The Town of Brookhaven will provide whatever programs would be necessary to meet the housing needs for all federal employees which may develop as a result of the award of the project to the Town of Brookhaven."

The remainder of the September 4 letter does little to amplify what Bloom meant by housing "programs." Nor does it indicate whether the initiative would have to come from the federal government as promisee. After requesting information as to the approximate number of positions and salary grades which would be filled by persons from outside the area, the letter went on to recite that the Town had adopted an open housing ordinance which had been "the subject of successful enforcement on several occasions," and that it was "considering possible assistance from HUD which provides for assistance to individuals in the rental of apartments. . . ."

> Moreover, cases in which New York courts have found ratification by a municipality have all involved a far stronger showing of knowledgeable assent than that made here. For example, in *Peterson v. Mayor, supra,* the city's common council signified its knowledge and endorsement of an architect's employment by authorizing construction based on his plans. Similarly, in *Potts v. City of Utica,* 86 F.2d 616 (2d Cir. 1936), the city council had evidenced acceptance of an engineer's provision of services in connection with municipal litigation by authorizing a bond issue to cover litigation expenses including employment of experts.

---

19. In *Seif, supra,* the New York Court of Appeals held that although four out of five members of the City Council knew that an attorney was rendering services at the request of the Mayor, ratification could not be inferred from the Council's failure to act promptly to discharge him. Since the City Council ultimately declined to confirm his appointment and instead passed a resolution directing corporate counsel to replace him, there was inadequate support for the jury's finding of ratification. As noted in the text, appellants here were unable to satisfy even the actual knowledge requirement which had been met in *Seif.*

There is no indication in the record that the parties discussed, let alone agreed upon, specific further actions to be taken by the Town Board to stimulate private or public housing development. Moreover, as Turetsky testified, there was a marked difference between the assurances GSA solicited with regard to housing and those relating to affirmative action requirements for construction work on the facility. The terms of the affirmative action agreement were "carefully structured so that we could hold the town to a contract that we in effect could impose . . . as differentiated from [solicitations made] principally to assist the federal government for the benefit of IRS employees. . . ." If GSA negotiators had believed that an enforceable contract concerning housing could and should have been made a condition of the lease award, they presumably would have specified the Town's obligations, as they did with regard to the affirmative action requirements. We may not supply such specifics by implication.

In effect, appellants ask that a federal court superintend, for an indefinite period, a Brookhaven program for low income housing. Since such programs generally require the cooperation of the federal government and of the private sector, the court would be required to assess on an ongoing basis whether the Town's degree of participation was adequate. So formidable a task and so diffuse a supervisory function is scarcely within the accepted reach of a court of equity.

The judgment of the District Court is affirmed.